In re the ADOPTION OF
B.D.W., a minor.

No. 27007.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 31, 2006.

Application for Transfer to Supreme Court
Denied Feb. 22, 2006.

Application for Transfer Denied
April 11, 2006.

William J. Fleischaker, Joplin, for appellant.

Jerry L. Holcomb, Joplin, for respondent.

NANCY STEFFEN RAHMEYER, Presiding Judge.

Mother[1] appeals from the grant of the termination of her parental rights in a suit on a petition brought by the foster parents of B.D.W. for adoption and to terminate Mother's parental rights. The first count of the petition alleged that, pursuant to

---

1. Father's rights were terminated at the same hearing, but he does not appeal the judgment. We set forth the petition for termination and adoption only as it relates to the termination of Mother's parental rights.

section 453.040(7),[2] consent of the natural Mother was not necessary for adoption because she had for a period of at least six months immediately prior to the filing of the petition for adoption willfully abandoned the child and/or willfully, substantially, and continuously neglected to provide the child with the necessary care and protection. The second count of the petition alleged four grounds under section 211.447.4 to support a determination that Mother's consent was unnecessary for an adoption: section 211.447.4(1), in that Mother abandoned the child by leaving her without any provision for parental support and without making arrangements to visit or communicate with her although able to do so; section 211.447.4(2), in that the child was adjudicated, abused or neglected and there was a repeated and continuous failure by Mother to provide the child with adequate food, clothing, shelter or education, or other care and control necessary for the child's physical, mental or emotional health and development; section 211.447.4(3), because B.D.W. had been under the jurisdiction of the juvenile court for a period in excess of one year and the conditions which lead to the assumption of jurisdiction still persisted or conditions of a potentially harmful nature continued to exist and there was little likelihood that the conditions would be remedied at any early date thus diminishing the child's prospects for early integration into a stable and permanent home; and section 211.447.4(6), in that Mother was unfit to be a party to the parent/child relationship due to a specific pattern of committing specific abuse toward the child and being unable for the reasonably foreseeable future to appropriately meet the ongoing physical, mental or educational needs of the child. In an extensive, detailed judgment, filed April 15, 2005, the court transferred legal custody of the child to the Petitioners for the purpose of adoption and terminated the parental rights of Mother and Father. The trial court granted the termination for multiple reasons on five statutory bases, sections 453.040(7), 211.447.4(1), 211.447.4(2)(d), 211.447.4(3), 211.447.4(3)(a), and made findings under sections 211.447.6(1)-(5).

Mother brings five points on appeal, the first four points specifically challenging the sufficiency of the evidence under sections 453.040(7), 211.447.4(1), 211.447.4(2)(d), and 211.447.4(3). Mother does not allege error in the court's findings on the factors used in deciding whether to terminate the parent-child relationship under section 211.447.6. Additionally, Mother claims in point five that the trial court erred in refusing to order an execution of a medical authorization and the production of the child for a physical and mental exam.

### FACTS

B.D.W. was born November 9, 2000; she came under the jurisdiction of the Jasper Juvenile Court beginning January 31, 2001, at the age of two and one-half months, and was fifty-two months old at the time of the termination order. Petitioners filed their petition for adoption and the termination of parental rights on July 30, 2003; the hearing was held February 10, 2005, and the judgment was entered April 15, 2005. The court transferred legal custody of the child to the Petitioners for the purpose of adoption and terminated the parental rights of Mother and Father.

B.D.W. came into the jurisdiction of the juvenile court after the Division of Family Services ("DFS")[3] received a report in January 2001 regarding domestic violence

---

**2.** All references to statutes are to RSMo 2000, unless otherwise specified.

**3.** The Division of Family Services is now known as the Children's Division.

in the household of Mother and Father. When Father was arrested at the home for the domestic violence, police also found a bag allegedly containing marijuana and other drug paraphernalia. DFS reviewed Father's records and discovered that he had been convicted approximately nine years prior of misdemeanor assault of an infant.

Mother initially retained the physical custody of B.D.W. on the condition that Mother and child would remain at a women's shelter, Lafayette House. During this time, Mother filed an order of protection against Father alleging that on January 29, 2001, Father hit, slapped, and choked her; she further stated that for two years he had consistently abused her in the same way, often leaving her with black eyes. A full order of protection was issued; however, Mother subsequently dismissed the order. She stated, "It is hard to resolve any problems if we can't talk." On March 26, 2001, Lafayette House reported concerns to DFS over Mother's behavior because Mother was not caring properly for child. Mother left the child unattended for long periods of time in her carrier, reportedly spending long periods of time on the phone with Father and her participation in the domestic violence program at Lafayette House was minimal. B.D.W. was placed in foster care with Petitioners on March 26, 2001, and has remained in their custody throughout the proceedings.

Although Lafayette House had secured housing for Mother separate from Father when she left the shelter, she chose to move in with Father. Mother missed five of ten appointments with her counselor after leaving Lafayette House. Mother and Father were granted supervised visitation with B.D.W. of one visit per week; however, the couple soon lost this visitation as a result of Father's actions during

visitation. On June 25, 2001, Father was holding B.D.W. and stated that he could snap the child's neck before anyone could do anything about it. On July 2, 2001, Father verbally assaulted and threatened a DFS caseworker and was arrested; he later pled guilty to assault, peace disturbance and unlawful use of a weapon. The court ordered services for Mother and Father to cease on July 3, 2001, until they could demonstrate emotional stability; however, counseling was provided to Mother.

Mother's therapist explained to her that the expectation of DFS was to reunify Mother and B.D.W. and explained what was required of Mother in order for reunification to occur. Mother was told to continue attending domestic violence classes and individual counseling at Lafayette House to work on co-dependency issues. Mother was again allowed supervised visits of one hour per week with B.D.W., beginning August 14, 2001, after she returned to counseling at Lafayette House. A parent aide transported B.D.W. to and from the visits and Father transported Mother to and from the visits. This arrangement soon led to problems when Father threatened the parent aide and a DFS security guard during a supervised visit on September 26, 2001. The visits were subsequently ceased by court order and Father was barred from DFS property.

Even though a DFS caseworker informed Mother that reunification with B.D.W. would be difficult with Father in her life, Mother arrived with Father at the next visit and soon began missing appointments with her counselor. Mother married Father in September 2001, despite his aggression towards her and others, but did not inform her caseworker of the marriage. Mother's caseworker later discovered that Mother and Father were married and in letters dated December 11,

2001, and March 5, 2002, the caseworker specifically informed Mother and Father what was required of them if they wished to be reunited with B.D.W. Father would need to attend marriage counseling, domestic violence classes, individual therapy, and submit to drug testing. Mother would need to continue attending domestic violence classes and individual therapy.

Mother, meanwhile, was allowed supervised visits with B.D.W. beginning in March of 2002; however, she was still in a relationship with Father. By April of 2002, with B.D.W. under the jurisdiction of the juvenile court for more than one year, DFS reported that services provided to Mother included a drug assessment, parenting classes, a parent aide, domestic violence classes, individual counseling, marriage counseling, and visitation with the child and team meetings. At this point, DFS also reported that Father had been admitted in December of 2001 to an institution in a delusional state and treated for depression with psychotic features. His physician stated that Father risked a fifty to seventy-five percent relapse rate if he did not stay on medication. Because a relapse meant he would become violent, DFS requested documentation of stability in Father for a period of ninety days. He was required to attend counseling and submit to drug testing. Drug evaluations of Father in April and June of 2002 showed that Father was positive for drugs; he admitted in team meetings that he used marijuana on a daily basis. Follow-up treatment was recommended, but it did not appear that he continued with treatment and he failed to reach any type of stability.

At a permanency hearing held June 20, 2002, with both Mother and Father present and B.D.W. having been in alternative care for fifteen months, the case goal still remained reunification. Progress still

failed to occur and in September of 2002, a caseworker spoke with Mother about the possibility and meaning of terminating parental rights and informed her of possible options. Mother told the caseworker that she had married Father in order to bring their family together and she still trusted Father despite the fact that her relationship with him interfered with possible reunification between her and B.D.W.

Shortly after this meeting, Mother filed a second petition for an order of protection on October 11, 2002, alleging that Father had put a screwdriver to her throat, beat her with a flashlight, kicked her in the ribs, hit her in the nose, pinned her to the floor, choked her, and accused of her of "sleeping around." She admitted that she feared he would abuse her over the "slightest thing" and stated that he had threatened to kill her. Mother dismissed the petition a few days later, just as she had done with the first full order of protection. Mother did not inform her caseworker that severe abuse had occurred earlier in the month, nor did she inform DFS of any of the abuse alleged in the petition. In fact, she lied to DFS about violence in the relationship.

The permanency planning review team met again on October 30, 2002, and this time recommended that DFS seek termination of parental rights. Twenty-one months had now passed since the inception of the court's jurisdiction and little or no progress had occurred on the part of B.D.W.'s parents. Mother was advised at this meeting that if she remained in a relationship with Father, her parental rights could be terminated. On November 2, 2002, Father assaulted Mother again and he was charged with assault in the second degree. Again, Mother did not report the abuse to DFS; however, she had a meeting with DFS a few days after the incident and the caseworker observed

Mother's bruised face and bloodshot eyes. Mother admitted that in the past Father had broken her nose approximately five times, but she still maintained that he would improve his ways. She stated that her goal was to reunite her family. She hoped Father would want her and B.D.W. and that he would one day be safe to be around. The court ordered visits between Mother and B.D.W. terminated on November 5, 2002. Mother's last visit occurred on November 4, 2002.

After the assault on Mother in November, Father pled guilty to assault in the third degree and received 30 days shock incarceration and a one-year suspended execution of sentence. Mother remained by his side. She reported to DFS in January 2003 that she and Father were still together, receiving services from Lafayette House, attending marriage counseling, and generally doing well. The couple, however, was evicted from their home in February of 2003 and a petition for rent and possession was filed against them on August 25, 2003.

Father was ordered to pay $105.00 per month for child support on March 8, 2002, but to the date of the hearing paid no support. Mother was ordered to pay $228.00 per month, retroactive to November 15, 2002, but failed to make the payments. Her unemployment benefits were intercepted pursuant to the child support order. When the court approved a case goal of adoption and termination of parental rights at a July 10, 2003 permanency hearing, Mother's attorney requested support payments be abated, and the court complied. She subsequently paid nothing from July 22, 2003, until May 13, 2004; however, by the time of the hearing, she was current in all past due support. She failed to provide the child with anything equivalent to money that would constitute adequate support such as food, clothing, or other necessaries during the period that she did not pay support.

After the court had approved a case goal of adoption at the July 10, 2003 permanency planning hearing and the Petitioners had filed their petition for adoption and termination of parental right in July 2003, Mother sent a letter to the court, dated September 25, 2003, stating that she was finally separated from Father and living with her father and grandmother. B.D.W. had now been in foster care for thirty-three months.

Wess Baugh, a licensed psychologist, testified at the termination hearing that he had done a psychological evaluation and parenting assessment on Father and separately interviewed Mother in conjunction with Father's evaluation. Baugh noted that prior to her relationship with Father, Mother had maintained an emotionally abusive long-term relationship with a man that cheated on her and treated her badly. This man was eventually arrested for sodomy of teenage girls and producing pornography. Baugh recommended that Father not be considered a placement for B.D.W.; he also stated that Mother's efforts to convince the court that she was separated from Father should be considered suspect. He believed Mother's co-dependence might cause her to deceive the court and testified, "With regard to [Mother] that if she remains in a relationship with [Father] that she should not be considered a viable placement option although she shows intelligence, devotion to the child, her judgment in remaining with [Father] who, I felt, was a physical and emotional threat to her and the child, is a poor one and would put the child at risk."

Baugh also believed that Father's aggressive presence would intrude on any attempt at successful reunification between Mother and B.D.W. Father brought in a "rap sheet" containing forty-four offenses

over the years in response to Baugh's request for a list of all infractions or charges against Father. Father also admitted that he disrespects legal authority and believes that they are as crooked as anyone else is, they just have "a badge." Baugh testified that in the time after he evaluated Father, he was not aware that Mother had received or even sought treatment. Baugh opined that therapy was necessary for Mother if she wanted to be a successful parent or responsibly choose a future partner. Baugh had serious concerns that unless Mother had received treatment, she would enter into future relationships with the same potential for disaster.

Psychologist Judith Kellenberger testified that she had conducted a bonding assessment between B.D.W. and Petitioners on November 26 and December 2, 2002. Kellenberger was aware that B.D.W. had been with the Petitioners all but about three months of her life. Kellenberger testified that B.D.W. had a very strong attachment to Petitioners, who she perceived as parents. She believed removing B.D.W. from the care of Petitioners would be detrimental to the child.

Jan Snider Kent, a clinical psychologist who evaluated B.D.W. on several occasions, claimed B.D.W. suffered from several behavior disorders in addition to respiratory problems requiring extensive medical intervention. Kent believed B.D.W.'s needs were met by Petitioners and recommended that no visitation occur between B.D.W. and Mother. Kent stated that B.D.W. did not deal well with change because she was emotionally very fragile and opined that any change for B.D.W. would "just be devastating to her." B.D.W. did not remember Mother.

While acknowledging at trial that DFS had advised her to separate from Father, Mother claims she remained with him for five years because she believed she could make him better. She admitted that for two years after the court initiated jurisdiction, her situation had remained unchanged and little progress had occurred; she also disclosed that when she and Father were together, Father used illegal drugs on a daily basis. Although she claims to have separated from Father in July 2003, she did not file for divorce until July 2004 and she stated that Father continued to harass her even after that. Mother had contact with Father the week before the trial. She claimed he called her at her job. When asked if she talked to him, the following exchanged occurred:

A. Yeah, a little bit before I realized it was him. And he demanded to know how my little brother died.

Q. And did you at that—did you terminate the conversation?

A. I was asking him: What do you mean? Because I didn't realize it was him at first and I was wanting to know how he found out this information.

Q. Once you realized it was him what did you do?

A. I quit talking and he demanded to know again how my little brother died. And then he said: Never mind, I already know. I'm going after your dad and I'm taking him out.

Q. Okay. And then what did he do— after that phone conversation?

A. He hung up on me. And I turned around and called my family and then called the police.

Also, Father had been at her place of business just two days before the trial. Mother testified,

I tried to ignore him at first. One of the other salesmen brought him to my attention. I said: What do you want? He brought in a birth certificate that had a

wrong date on it, according to him, demanded to know where I got it because my handwriting was on the envelope it was in.

And I told him the only time I had any access to his stuff is if he gave it to me or his mom gave it to me to hang on to. And then he said that he had already talked to his mom and for me to expect to hear from the FBI. And then he turns around and walks off.

## Trial Court Findings and Conclusions

The trial court made detailed findings of fact and conclusions of law. First, pursuant to section 453.040(7), Mother's consent for adoption was not necessary because she had willfully abandoned the child and had willfully, substantially, and continuously neglected to provide the child with necessary care and protection for a period of at least six months, immediately prior to the filing of the petition for adoption. Her abandonment was evidenced by her continued enmeshment with B.D.W.'s violent and abusive father, which contributed to the child remaining in alternative care for an inordinate period of time leading up to the court's approval of a case plan of adoption and the filing of the petition for adoption. The neglect was evidenced by Mother's failure to pay child support in the six months preceding the filing of the Petition for Adoption, specifically from July 22, 2003, up to May 13, 2004.

Pursuant to section 211.447.4(1), grounds existed for termination of parental rights because Mother abandoned the child for a period in excess of six months without good cause, by leaving the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so. The abandonment occurred because of Mother's continued enmeshment with the child's violent and abusive father,

which contributed to the child remaining in alternative care for an inordinate period of time leading up to the court's approval of a case plan of adoption. The neglect again was evidenced by Mother's failure to pay support in the six months preceding the filing of the petition for adoption, specifically from July 22, 2003, to May 13, 2004. Mother made no payment of support from the date of the support order on November 15, 2002, up to June 17, 2003, which is another six-month period of non-support. In addition, the six payments made between June 17, 2003, and July 22, 2003, were via involuntary withholding from Mother's unemployment benefits. The only voluntary payments made by Mother commenced approximately nine months after the filing of the petition for adoption and this period was preceded by another six months of non-payment. Mother was capable of gainful employment during the majority of the time the child had been under the court's jurisdiction as the unemployment benefits involuntarily intercepted were indicative of some work history by Mother as well as her employment at Hank's Fine Furniture.

Pursuant to section 211.447.4(2)(d), grounds existed for the termination of parental rights because the child had been adjudicated, abused or neglected and there was repeated and continuous failure by Mother to provide the child with adequate food, clothing, shelter, education, or other care and control necessary for her physical, mental, or emotional health and development. Again, this was evidenced by Mother's failure to pay child support. Mother did frequently bring gifts, clothing, and toys to B.D.W., but overall these efforts did not constitute adequate food, clothing, shelter, or education, and the court considered them to be "token" efforts. Father had a prior conviction for abusing another young child and he had abused Mother since 1999, when they be-

gan dating, and Mother remained with him. Her inability to remain apart from the child's violent and abusive father from the date of the court's jurisdiction until well after the change of case plan from reunification to termination, a period of approximately thirty months, demonstrated a failure by Mother to provide the child with adequate support as defined by law and a failure to provide care for B.D.W. during her lifetime. Except for three months of her life, all support to B.D.W. was provided by the State of Missouri and the Petitioners.

Pursuant to section 211.447.4(3), grounds existed for the termination of parental rights because B.D.W. had been under the jurisdiction of the juvenile court for a period in excess of one year and the conditions which led to the assumption of jurisdiction continue to persist, or conditions of a potentially harmful nature continue to exist, and little likelihood exists that those conditions will be remedied at an early date so that the child can be returned to Mother in the near future and the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

Pursuant to 211.447.4(3)(a), grounds for termination of parental rights existed because the child had been under the court's jurisdiction from January 31, 2001, through the date of trial on February 10, 2005, a period in excess of forty-eight months. The conditions that led to the court taking jurisdiction included domestic violence in the presence of the child, Father's prior criminal conviction for the abuse of another child, Father's arrest for domestic violence, and the presence of marijuana and drug paraphernalia in the home. The terms of the social service plan of DFS were reasonable, and Mother made only minimal progress towards reu-nification from the date of the initiation of the court's jurisdiction until well after the case goal changed to termination of parental rights. Mother admitted Father was violent and abusive toward her for most of the duration they were together. She admitted that Father had broken her nose on several occasions. She filed and subsequently abandoned two adult abuse actions against him while this case was pending. She was deceptive to DFS caseworkers about the times Father was violent toward her. She also failed to timely inform DFS that she and Father were married. Services provided to her have been numerous. The referrals included referrals to Lafayette House and Ozark Center for a substance abuse assessment in March 2001, parenting classes in 2001, a parent aide in July 2001, case management at DFS, domestic violence classes at Lafayette House over a two-year period, counseling with Regina Jordan for co-dependency issues, individual counseling, shelter at Lafayette House from January 2001 to March 2001, marriage counseling, Family Center Out of Home Meetings, Permanency Planning Team meetings, and the opportunity to have visitation with B.D.W., facilitated by DFS. Despite all the services focused on preventing domestic violence, she continued to remain in an abusive relationship.

After Father abused her in 2002, Mother filed an adult abuse order of protection but then abandoned it. She received another severe beating in early November 2002 and she failed to timely report these incidents to DFS until her injuries were so obvious she could no longer ignore it. In early 2003, she reported to a caseworker at DFS that she and Father were attending marriage counseling and things were going well; however, on February 10, 2003, she and Father were evicted from their home. Mother and Father remained in a relationship until at least July 2003, a period of over thirty months, all of which

time, child had been in alternative care. During this time, Mother proved to the court that she was unable to protect herself from Father and would not report the violence to individuals that could help her. Mother's track record showed that little had changed from the time the court gained jurisdiction until the time the petition for adoption was filed.

Mother's long history of abuse, her inability to protect herself, and her unwillingness to report the abuse showed that a future risk of substantial harm to the child would exist if she were placed in Mother's care. Even after the petition for adoption was filed, DFS provided Mother with a detailed and thorough home study at her residence. The home study noted the long history of being abused by Father, reconciliation with Father despite the abuse, and the fact that her present home was insufficient in size for Mother and B.D.W. The author of the report stated that reunification would be a very lengthy process. Any attempt at reunification would only delay child's integration into a stable and permanent home. The home study opined that Mother could remedy the inadequate size of the home in the future if required, but this belief was speculative at best. Further, Mother's track record of trying to remedy her relationship with Father was not good after she repeatedly attempted to separate from him. Mother admitted at trial that Father continued to harass her, and this caused concern over her ability to protect herself or B.D.W. Mother was represented throughout most of the proceedings by capable and experienced counsel who advocated for Mother, including filing a motion to change caseworker and a motion to abate child support as well as representing her at all permanency review hearings.

Pursuant to 211.447.4(3)(b), grounds for termination of parental rights existed because the efforts of DFS and the Juvenile Office were reasonable, but Mother was unable to adjust her conduct on a continuing basis to provide a proper home for B.D.W. B.D.W. has been in the custody of Petitioners for most of her life. Despite extensive services to address domestic violence and co-dependency, she was unable to change her situation in any type of timely fashion. Mother was frequently less than forthcoming with DFS over the nature of her relationship with Father and his continued abuse. Even if one were to believe Mother's contention that she is now free from the child's father and can be a healthy parent, it has to be recognized that this transformation took Mother the better part of three years to achieve while B.D.W. was out of her care and bonding with Petitioners. B.D.W. now believes Petitioners are her parents. Petitioners have met her medical and behavioral needs. This bonding was confirmed by psychologists Judith Kellenberger and Jan Snider Kent.

Pursuant to section 211.447.6(1), grounds for termination existed because B.D.W. has few, if any, emotional ties to Mother. As stated, B.D.W.'s last contact with Mother was on or about November 5, 2002, when B.D.W. was not quite two years old. Psychologists Judy Kellenberger and Jan Snider Kent both testified that B.D.W. had significant bonds and emotional ties to Petitioners and any attempt to reintroduce Mother into her life would be detrimental to B.D.W. because she considers Petitioners her mom and dad.

Pursuant to section 211.447.6(2), grounds for termination existed because Mother failed to maintain regular visitation and contact with B.D.W prior to the court ceasing visitation in November, 2002. Mother chose her relationship with Father rather than diligently addressing the prob-

lems, which prevented her from achieving reunification with B.D.W. in a timely fashion, despite the numerous services provided her by DFS. Mother's visitation was ordered ceased in November 2002 and Mother still remained with Father despite his abuse and his interference with reunification.

Pursuant to 211.447.6(3), grounds for termination existed because Mother contributed little support toward the cost of care and maintenance of B.D.W. while B.D.W. was in alternative care, even though she was financially able to do so. Mother was ordered to pay $228.00 per month for child support, retroactive to November 15, 2002. Mother failed to make these payments, but her unemployment benefits were intercepted pursuant to the child support order and the Missouri Automated Child Support System received payments in the sum of $78.66 on June 17, June 24, July 1, July 8, July 15, and July 22, 2003. Mother also failed to provide the child with anything equivalent to money that would constitute adequate support such as food, clothing, or other necessaries during this period of time. Mother's support payments resumed ten months after the filing of the petition for adoption. Mother was gainfully employed during the majority of the time the child had been under the jurisdiction of the court and was capable of making payments.

Pursuant to 211.447.6(4), grounds for termination existed because no additional services remained that DFS and the juvenile office could provide to Mother. No service could bring about the lasting parental adjustment that would enable B.D.W. to return to Mother within an ascertainable period of time. The terms of the social service plan of DFS were reasonable, but Mother made only minimal progress toward reunification.

Pursuant to 211.447.6(5), grounds for termination existed because Mother manifested a disinterest in and lack of commitment to B.D.W. Mother's failure to consistently support B.D.W., her inability to address the issues of domestic violence and co-dependency in a timely fashion, and her continued enmeshment with Father demonstrated this disinterest and lack of commitment. Mother's professed separation from Father took the better part of three years to achieve, during which time B.D.W. was out of her care and bonding with Petitioners who she believes are her parents.

### Burden of Proof/Standard of Review

 "[We] will affirm the trial court's decision to terminate parental rights unless the 'record contains no substantial evidence to support the decision, the decision is against the weight of the evidence, or the trial court erroneously declares or applies the law.'" *In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005) (quoting *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). A trial court can terminate parental rights only if the grounds for termination are supported by clear, cogent and convincing evidence, which is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true. *Id.* Furthermore, "[t]he presence of evidence to support one statutory ground for termination is sufficient to terminate a parent's rights." *Id.* "[B]ecause parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *Id.* Therefore, a decision to terminate such rights will be reviewed closely. *Id.*

■ Abandonment, under sections 453.040(7) and 211.447.4(1), has been described as " 'an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and opportunity for the display of filial affection.' " *In re P.G.M.*, 149 S.W.3d 507, 514 (Mo.App. S.D.2004) (quoting *In re Watson's Adoption*, 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946)). Neglect is " 'primarily a failure to perform the duty imposed upon the parent by law and by conscience.' " *In re K.L.C.*, 9 S.W.3d 768, 773 (Mo.App. S.D.2000) (quoting *C.B.L. v. K.E.L.*, 937 S.W.2d 734, 737 (Mo.App. E.D. 1996)). It must be intentional, deliberate, and without just cause or excuse. *C.B.L.*, 937 S.W.2d at 737.

## Points I–IV

■ The fundamental rationale for each of Mother's arguments in her first four points is that there was insufficient evidence to support a finding that Mother had abandoned or neglected B.D.W. because the only evidence against Mother was her being "enmeshed" in a relationship with Father and she had in fact provided meaningful financial support to the child. Although Mother claims there was no deliberate abandonment of the child by Mother, she focuses her argument on the claims of financial abandonment. While it is true that failure to provide support alone has not been held to warrant termination of parental rights, it is not necessary for us to address whether the evidence concerning the payment of child support was sufficient to find abandonment or neglect of the child. *See C.B.L.*, 937 S.W.2d at 738 (court had found no case where failure to provide support alone had been held to warrant termination of parental rights; failure to contribute to the financial support of a child coupled with other evidence as to lack of contact with

them was sufficient to sustain the findings of the willful neglect in failing to provide proper care and maintenance). The evidence of the intentional, deliberate choice by Mother of involvement with a clearly unsuitable husband and father, rather than choosing to parent B.D.W. is sufficient evidence of neglect.

From the start, we base our decision on the premise that Father was inappropriate as a caretaker throughout all of the proceedings; the unchallenged evidence is that Father was a bully to DFS workers, a wife abuser, a regular illegal drug user, a child abuser, and uncommitted to making any changes to make himself an acceptable parent. It is also uncontroverted Mother knew Father was a daily illegal drug user and that he was seriously abusive to her; she testified that he had broken her nose on several occasions, bloodied her eyes, bruised and kicked her, choked her, and put a screwdriver to her throat. The single real issue before this Court is whether the victim of abuse, who has had no allegations of direct abuse or neglect of the child, can have her parental rights terminated for remaining in the abusive relationship for a period of over thirty months while the child is out of her care and in foster care. We answer in the affirmative.

Substantial evidence supports a finding, whether designated as abandonment or neglect, that Mother was given every opportunity and many resources to remove her from the abuser, yet Mother made the voluntary choice to stay with Father to "keep her family together," in spite of the fact that it was her relationship with him that was keeping the child from being in the family. The evidence is replete with opportunities for Mother to choose the parental relationship over a relationship with Father, yet she defied all advice from DFS, her family, and counselors. Mother sought the protection of the court through

orders of protection and then dismissed them. Although Mother argues that no one directly told her if she did not leave Father her parental rights would be terminated, it was not necessary for anyone to do so. She was told repeatedly that the child would not be returned to her with Father present; the child would not have been in foster care at all had she chosen the child over Father while in Lafayette House. It was not until the petition for adoption and the termination for her parental rights was filed that she indicated that she was willing to give up on the relationship with Father; however, she did not do so for another year.

■ Mother argues that by the time of the hearing she had divorced Father, began living independently, was steadily employed, began paying child support and retained counsel to fight the termination. Those are commendable changes and it may have been a different situation had so much time not elapsed before Mother made those decisions. The trial court, however, was free to consider the evidence before it that Mother's efforts to convince the court that she was truly separated from Father were suspect in that she hid the abuse from the court, did not inform anyone of her marriage to Father, and lied to the DFS caseworker about her present living conditions when she had been evicted from her home. Mother did not present evidence at trial that she had resolved her "co-dependency" issues with counseling. The issues of abandonment or neglect are determined by the parent's conduct, which may have occurred before, after or during the six-month statutory period. *H.W.S. v. C.T.*, 827 S.W.2d 237, 240 (Mo.App. E.D.1992). The court must look to the totality of a parent's conduct prior to and after the filing of a petition for termination and past patterns of a parent provide vital clues to present and future conduct. *In re K.A.W.*, 133 S.W.3d 1, 9 (Mo. banc 2004).

■ The harmful condition of continued exposure of a child to a violent person, who exhibited disregard for a child's welfare, has been held to be sufficient to terminate parental rights, even if there was no evidence that the violence or erratic behavior was ever specifically directed at the child. *In re L.D.R.*, 169 S.W.3d 137, 142 (Mo. App. E.D.2005). As *L.D.R.* noted, "the trial court need not wait until an incident occurs in order to conclude that Mother poses a significant risk of harm to her children" and despite father obtaining an order of protection, he was still unable to prevent her contact with the children. *Id.*

Likewise, *In re C.M.K.*, 140 S.W.3d 219 (Mo.App. S.D.2004), held that the termination of parental rights was supported by substantial evidence when the mother was found to be unfit to be a party to the parent-child relationship due to a pattern of domestic violence. *Id.* at 226. In *C.M.K.*, the mother continued to associate with the children's father despite the fact that she had been warned of the effects on the children. *Id.* at 224. The court, while commending the mother for her efforts to be re-united with her children, noted that, while the record did not contain any information that the children were physically abused by the mother, "Mother was well-aware that the children's exposure to domestic violence was not healthy and she was advised on numerous occasions to distance herself from Father's abuse." *Id.* at 225–26. Substantial evidence supports the trial court finding that the child was neglected when Mother failed to protect the child from a clearly inappropriate caregiver by maintaining a relationship with him with a clear risk to herself and the child. Finding neglect under any of the sections supports the termination of Mother's pa-

rental rights, we deny points one through four.

### Point V

■ Mother claims in point five that the filing of the petition for termination of parental rights placed the medical condition of B.D.W. at issue and, therefore, the court erred in refusing to order an independent physical and mental examination or to produce B.D.W.'s medical records. The trial court had ordered the juvenile office to produce any medical records that it had to counsel for Mother, but did not order that an authorization be signed allowing an independent examiner to review the records. Mother argues that the child's medical condition is relevant to the extent that it reflects upon whether it was in the best interest of B.D.W. to terminate Mother's parental rights.

We do not find that the court abused its discretion in refusing to order an independent physical examination or to order an authorization for the child's medical records. As noted herein, the grounds for termination of Mother's parental rights are not based upon B.D.W.'s medical condition, but rather are based on Mother's insistence upon a relationship with Father, which was potentially harmful to the child. Mother was provided with the child's counseling records and there is no indication that she would not have been allowed to depose or subpoena the counselor or therapist's records to prepare for trial. Substantial evidence for termination existed without any evidence of the child's physical or mental health; the child had spent all but three months out of Mother's care. To the extent the child's physical and mental health were relevant, it was on the issue of the child's best interest. Substantial evidence supports the court finding that there was no bond between Mother and child, who was five years old at the time of the trial, but a strong attachment between the child and the people who had raised her and that removing the child from these people would be detrimental to the child's mental health. Mother did not contend otherwise. She acknowledged that it would be in the child's best interest to remain with the foster parents until a reunification could occur. Given that Mother was essentially a stranger to B.D.W., we do not find that Mother was prejudiced in the denial of an independent examination of the child or an authorization for the production of further medical records. The point is denied.

The judgment is affirmed.

PARRISH, J., and MAUS, Senior Judge, concur.