**In the Interest of: D.D.C., Plaintiff,**

**N.J.A. and A.R.A., Respondents,**

v.

**D.C. (Natural Father), Appellant.**

**No. WD 73294.**

Missouri Court of Appeals, Western District.

Aug. 16, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 2011.

Application for Transfer Denied Dec. 6, 2011.

---

2. Because Reppy's first point on appeal is dispositive, we need not and do not address Point II of Reppy's appeal.

David W. Whipple, Jamie L. Beucke, Independence, MO, for Appellant.

James A. Waits, Kansas City, MO, for Respondents.

Anastacia R. Adamson, Kansas City, MO, for Plaintiff.

Before: THOMAS H. NEWTON, P.J., CYNTHIA L. MARTIN, and GARY D. WITT, JJ.

THOMAS H. NEWTON, Presiding Judge.

D.C., father to D.D.C., appeals the trial court's judgment terminating his parental rights and permitting D.D.C. to be adopted by N.J.A. and A.R.A. We affirm.

### Factual and Procedural Background

L.H. (Mother) gave birth to D.D.C. (Child) in September 2006. D.C. (Father) and Mother were in a relationship and Father was listed on the birth certificate. At some point in 2007, Child received a skull fracture after falling from a balcony while in Mother's care. Father was not at home when this occurred. Both Mother and Father used methamphetamine during this time period, including while Child was present in the home. Father testified he was "tired of it," and in September 2007, Father took Child to Arizona. Mother travelled to Arizona to retrieve Child in February 2008.

In June 2008, Child came under the trial court's jurisdiction after Mother had a car accident in which she was determined to be under the "influence of something" with one or more children in the car. Child was shortly thereafter placed with A.R.A., Mother's cousin, (Foster Mother), and N.J.A. (Foster Father). Foster Parents had two other children.

Father was still in Arizona where he had five other children that ranged in age from six to 19. Father testified that Mother notified him in Arizona that Child had been removed from her care. Father was subsequently incarcerated in Arizona for unpaid child support for his other children until the beginning of 2009. In January 2009, he spoke with Child's case manager and asked what he needed to do to obtain custody of Child. He was told to come to Kansas City and obtain an attorney. Meanwhile, Mother gave birth to G.H. (Half–Brother) in February 2009. Half–Brother was also placed with Foster Parents, directly from the hospital.

Father returned to Kansas City in May 2009. He lived with Mother and began working part time. At some point, the Division told Father he needed to attend anger management classes; he had convictions for domestic violence against two of the mothers of his children. Father contacted UMKC's Community Counseling and Assessment Services (CCAS) and arranged for individual counseling.

Father attended Child's monthly Family Support Team (FST) Meeting in May 2009. He informed the Division that he wanted his daughter back and that he was beginning anger management classes. The Guardian Ad Litem (GAL) asked Father to undergo a psychological evaluation, but according to Child's case manager, he subsequently refused to do so unless it was court ordered. At trial, Father denied that he had refused to participate in a psychological evaluation.

In June 2009, Mother's infant nephew died while she was babysitting him. The child reportedly died from asphyxiation while sleeping in the bed with Mother and Father.

Father began short visits with Child at Child's day care, supervised by Child's therapist. Beginning in December 2009,

Father began bi-weekly one-hour visits with Child supervised by an independent therapist. The therapist testified that Child was initially guarded with Father, but that he allowed Child space and as time progressed, the relationship evolved. She testified that Father brought food, toys, books, and movies to the visits. Her progress report in April 2010 indicated that Child was affectionate with Father and Father was responsive to her needs.

From June 2009 until February 2010, Father participated in the individual counseling through UMKC's CCAS where he worked on managing anger and developing coping strategies. According to Father's CCAS intake, he was seeking treatment for anger management. He reported that he had been using drugs since the tenth grade. In January 2009, he allegedly quit using illegal drugs, but found it "very hard, especially when he gets depressed." He also reported drinking to the point of not remembering about once a month. The counselor's reports indicate Father's attempts to remain positive in light of a lack of progress towards gaining custody of Child, having such little time with her, a frustration and confusion with the court process and caseworkers, and receiving conflicting information about his rights. Mother and Father also participated in joint counseling, from January 2010 until the time of trial, because of the history of domestic violence.

Child's case manager testified that although Father told her that he was participating in the individual counseling sessions, Father initially refused to consent to the release of information other than the record of his attendance.

While seeking custody, Father voluntarily participated in drug testing which was given on a weekly basis. He tested positive for alcohol use on two occasions. On several occasions from May 2010 through August 2010, Father intermittently did not respond to a 24–hour call back for testing.

On September 11, 2009, Foster Parents petitioned for the termination of Mother and Father's parental rights, alleging abandonment and neglect, and sought to adopt Child, as well as Half–Brother in a separate petition. Half Brother's adoption was not contested by his alleged fathers. Hearings were held before the Family Court Commissioner (Commissioner) on September 9, September 10, and October 8, 2010. At the commencement of the proceedings, after the presentation of evidence related to drug testing, the Commissioner ordered that both parents be tested for methamphetamine. On the second day of hearing, Mother consented to the termination of her parental rights and to the adoption.

Child's case manager recommended both parents' parental rights be terminated because the children needed permanency. The case manager was at first unsure if there was a written services agreement for Father and acknowledged that Father was not provided with parenting classes, or drug or rehabilitation programming.

Child's therapist testified that Child had a number of behavioral problems when she first went to live with Foster Parents— sleeplessness, nightmares, anxiety, not eating, and lengthy tantrums. At the time of trial, she felt these behavioral issues were resolved but expressed concern about Child feeling she was in limbo. She testified that she currently was working with Child on fears, both normal childhood fears, and fears that she would be kidnapped by Mother or Father.

She stated that Child had a very strong parent-child bond with Foster Parents; they were Child's "parents, her caregivers, her protectors. She sees [Foster Father] as having immense powers and ability to

make things right and make the world a better place, and [Foster Mother] is mommy and she turns to her if she's upset or worried … She goes to her for the nurturing and the maternal care that is typical of a mother and child." She also testified that Child had a familial connection to her foster sisters and to Half–Brother, and had adjusted well to Foster Parents' home. She testified that removing Child from Foster Parents' home would be traumatic and likely to create long-term issues with trust and relationships. She recommended adoption by Foster Parents and stated that in her opinion, the ending of visitation would not have "much of an impact on [Child]."

Mother and Father's joint counselor had for a long period recommended a goal of reunification. In light of Mother's consent to termination, she stated that Father would have to take additional steps to move towards parenting Child by himself, including moving into his own home instead of living with Mother, moving from working a night shift to a day shift, and spending more time with Child to assess how prepared he was to care for her. The joint counselor thought that Father should continue to be monitored through urinaly-

sis and that if it appeared he had a problem, to then request he seek treatment. The joint counselor further testified that although about half of Father's take-home pay went to child support for his children in Arizona,[1] she thought he could maintain an apartment.

At the time of trial, Father was working full-time earning $15.55 an hour. He testified having a support arrearage for his children in Arizona of approximately $27,000. At the October 8, 2010, hearing, Father's results from the court-ordered drug test were introduced. His results were positive for methamphetamine use within the prior 90 days.

On October 21, 2010, the Commissioner issued its findings of fact and conclusions of law. Pursuant to section 211.447, the Commissioner found several grounds for termination and that termination was in Child's best interests. Additionally, the Commissioner found that Father's consent to the adoption was not necessary and recommended the adoption be approved as Child was in need of and deserved a stable and permanent home.

The following day, the trial court adopted the Commissioner's findings and recommendations.[2] Father moved for re-

---

1. Father was reportedly seeking modification of his child support obligations in Arizona. At the time of trial, he also had a custody case pending against the mother of two of the children.

2. An inappropriate amount of time has passed since final judgment was entered in this case. Section 453.011.2 mandates that "[t]he transcript from the prior court proceeding shall be provided to the appellate court no later than thirty days from the date the appeal is filed." It further bars us from granting more than one motion for an extension of time. *Id.* Motions for an extension of time to file the record on appeal were granted based on (1) the Court Reporter's Statement that the transcript had not been provided to Father as of January 1, 2011, because of a "computer sys-

tem failure" and that the expected date of delivery was "unknown"; and (2) a later statement from the Central Transcribing Supervisor that the transcript would not be given to Father until February 18, 2011. We admonish all those involved in parental termination and adoption cases to take heed that in addition to the statutory mandates, the Missouri Supreme Court has clearly stated that:

handling of termination of parental rights [must] be expedited in every way possible and with all deliberate speed. This we believe should apply to the filing of responsive pleadings, to pre-trial procedures, to hearings, to preparation of transcripts, to docketing and disposition, and to briefing, hearing and decision in the appellate system. Only by so doing will it be possible to minimize the harm to children who must

hearing; the trial court denied the motion. Father appeals, raising seven points.

## Standard of Review

■■■ Termination of parental rights requires the trial court to find a statutory ground for termination and that termination is in the child's best interest. *S.M. v. E.M.B.R. (In re Adoption of C.M.B.R.)*, 332 S.W.3d 793, 815 (Mo. banc 2011). The grounds for termination must be shown by clear, cogent, and convincing evidence. *Id.* Evidence is clear, cogent, and convincing when it "instantly tilts the scales" in favor of termination when weighed against the opposing evidence "and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted). We review whether the evidence before the trial court met this standard under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Id.* We thus affirm the trial court's judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* A finding that termination was in the best interest of the child must be supported by a preponderance of the evidence. *Id.* at 816. On appeal, we review the determination of the child's best interest for abuse of discretion. *Id.*

■■■ Our review is also informed by the constitutional implications of the termination of a parent's rights. *In the Interest of K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004). A natural parent's interest in raising his or her child is a fundamental liberty interest protected by constitutional due process. *Id.* We thus construe statutory provisions strictly "in favor of the parent and preservation of the natural parent-child relationship." *Id.* The trial court is obligated to maintain a preference for the parent retaining his or her parental rights. *In the Interest of P.C.*, 62 S.W.3d 600, 602 (Mo.App. W.D.2001). We likewise construe adoption statutes strictly in favor of the natural parents. *In the Interest of A.R.M.*, 750 S.W.2d 86, 89 (Mo.App. E.D. 1988).

## Legal Analysis

■■■ In his first point, Father argues that the trial court erred in terminating his parental rights pursuant to subsection 211.447.5(2)(b) for chemical dependency, and pursuant to subsection 211.447.5(2)(d) for failure to provide adequate support.[3] While we find insufficient evidence supporting chemical dependency as a ground for termination, the trial court's finding of inadequate support is supported by the record. Only one statutory ground for termination is required. *In the Interest of S.C.*, 914 S.W.2d 408, 413 (Mo.App. W.D. 1996). Additionally, Father does not challenge the trial court's finding of parental unfitness under subsection 211.477.5(6), which is also a ground for termination sufficiently supported by the record.

### Chemical Dependency: Subsection 211.447.5(2)(b)

■■■ The trial court found that pursuant to subsection 211.447.5(2)(b), Father has a chemical dependency. Subsection

remain in limbo while the judicial system runs its course. We do not believe that this is too much to ask of lawyers, judges, the court and juvenile personnel.
*D.G.N. v. S.M.*, 691 S.W.2d 909, 914 (Mo. banc 1985). While we are cognizant that technical problems may occur, where a child's fate hangs in the balance, all efforts should be put forth to expedite appeals as efficiently and quickly as possible.

3. For clarity of discussion, we address Father's points out of order.

211.447.5(2)(b) provides that grounds for termination may be:

> (2) The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
>
> . . .
>
> (b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child *and which cannot be treated* so as to enable the parent to consistently provide such care, custody and control;

(Emphasis added). Specifically, the trial court found that Father was "addicted to methamphetamines," had "a chemical dependency including alcohol and methamphetamine" and "routinely used methamphetamines while the child was present in the house." Father argues that the trial court's findings were insufficient because it was not shown by clear, cogent, and convincing evidence that he had a chemical dependency.

While we defer to the trial court's factual findings, "[t]he court is under an obligation to base its decision on the evidence presented at trial." *In re P.C.*, 62 S.W.3d at 603 (internal quotation marks and citation omitted). Our review of the record shows Father having an extensive history of illegal drug use, but at trial, it was not opined that Father had an addiction that could not be treated. *See In the Interest of W.C.*, 288 S.W.3d 787, 796 (Mo. App. E.D.2009) (a positive drug screen and drug paraphernalia in the home did not "instantly tilt the scales in favor of a finding of chemical dependency rendering Mother unable to appropriately care for the children."). In fact, Father tested clean for an extended period of time, maintained full-time employment, consistently pursued custody of his daughter, and attended each visitation, FST meeting, and counseling session—all indices which belie an untreatable addiction to methamphetamines.

While Father's illegal drug use presents significant concerns, "the required level of severity the court must find is specified by the statute." *In re K.A.W.*, 133 S.W.3d at 11. Under 211.447.5(2)(b), drug use is not grounds for termination, nor is chemical dependency: rather, the statute provides grounds for termination for a chemical dependency "which cannot be treated." This is not a case where treatment was attempted and failed. *See, e.g., In the Interest of R.S.L.*, 241 S.W.3d 346, 354–55 (Mo. App. W.D.2007). While the trial court asserted that Father "refus[ed] to pursue substance abuse treatment and relapse prevention therapy," no evidence was presented that substance abuse treatment was suggested or offered to Father. And while Child's case worker suggested that Father would not comply with a request for a psychological evaluation absent a court order, this does not translate into a refusal of substance abuse treatment, particularly in light of Father's cooperation in seeking individual therapy, joint counseling, his participation in the FST meetings, and his compliance with all the conditions of supervised visitation.

At trial, Father testified that he was willing to participate in on-going substance abuse counseling or therapy. The trial court found that "when asked in his deposition if he thought it would benefit him to participate in any ongoing substance abuse treatment, counseling or therapy he said, 'No.'" Although we share the trial court's "significant" and "grave" concern with Father's deposition answer and defer to the trial court's factual findings, we cannot find clear, cogent, and convincing evidence that Father refused treatment as no evi-

dence was presented that treatment was offered.

Absent evidence of a service plan, a drug or alcohol assessment, a request or an attempt at treatment, the record lacks clear, cogent, and convincing evidence that Father had a chemical dependency *"which cannot be treated* so as to enable [Father] to consistently provide ... care, custody and control." § 211.447.5(2)(b) (emphasis added).

### Failure to Support: Subsection 211.447.5(2)(d)

■ The trial court also found ground for termination for failure to adequately support. Subsection 211.447.5(2)(d) provides neglect as a ground for termination by:

> (d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development;

Termination under this subdivision requires a showing that "the parent has not fulfilled the affirmative duty to support, communicate with and visit the child and show that the parent lacks a commitment to and interest in the child." *In the Interest of J.M.N.,* 134 S.W.3d 58, 69 (Mo.App. W.D.2004) (citing the predecessor subsection, § 211.447.4(2)(d); the subsections were renumbered in 2007). The terms "adequate" and "financially able" are flexible to "cover the spectrum of factual situations and parental finances." *In the Interest of A.L.B.,* 743 S.W.2d 875, 883 (Mo. App. E.D.1987).

The trial court found that during the six months preceding the filing of the petition, Father had the ability to contribute at least $100 per month for Child's support, but did not do so, and that Father had "no record or documentation of having contributed any support for her during that period." In the year prior to the filing of the petition, Father contributed little or nothing to Child's support, and any support contributed after the filing of the petition was at best "[de minimis] especially considering that the amount contributed was from birth mother and alleged natural father together and intended for both [Child] and [Half–Brother]."

■ Neglect is a parent's failure to perform the duties imposed by law and by conscience. *In re Adoption of B.D.W.,* 185 S.W.3d 727, 738 (Mo.App. S.D.2006). Parents are obligated to support their children even if they are in the custody of the Division, even absent a court order or request from the Division. *In re S.C.,* 914 S.W.2d at 412. Father appears to have made no provisions for Child's care or needs while in Arizona, and his contribution to Child's support appears to have been limited to some toys and clothes after his return to Kansas City. It appears that it was only after the filing of the petition that Father and Mother provided "some money," for Child and Half–Brother, somewhere approximating $300 in checks and money orders. Even where a parent works only part-time or earns minimum wages, he or she still has an obligation to provide support for the child. *Id.* According to the testimony at trial, Father worked full-time, had sufficient income to afford an apartment, and admitted that he could have provided at least $100 a month for Child. However, he did not. The trial court did not err in finding that Father failed to provide support for Child when able to do so and sufficient evidence supports the trial court's finding of ground for termination under subsection 211.447.5(2)(d).

### *Parental Unfitness: Subsection 211.447.5(6)*

The petition alleged and the trial court found parental unfitness to be a ground · for termination. Subsection 211.447.5(6) provides in relevant part that rights may be terminated if:

The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse, including but not limited to . . . child abuse or drug abuse before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.

Under this provision, "the juvenile court must determine that the parent is currently unfit to be a party to the parent and child relationship, supported by findings as to acts or conditions that persist at the time of termination." *In re W.C.*, 288 S.W.3d at 801. The trial court found Father to be unfit "because of a consistent pattern of committing drug abuse, including smoking methamphetamine while the child was present in the house exposed to the smoke" and that such abuse rendered Father "unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child."

Father testified that he and Mother were both using methamphetamine prior to his departure for Arizona as often as twice a week in the home while the children were present. He argues that the court must regard this abuse as past action and that the termination proceeding may look to past acts only to the extent that they predict future behavior. *See In re K.A.W.*, 133 S.W.3d at 9–10. He urges that we must look to the period prior to the hearing in which he tested negative for methamphetamine, rather than the single positive test at the time of the hearing.

However, Father's positive drug test at trial is also a reasonable predictor of future behavior. Father was still using methamphetamines at the time of termination, which shows a continued threat that he will use while caring for her as he did in the past. Moreover, unlike chemical dependency rising to the level of neglect or abuse, termination for parental unfitness under 211.447.5(6) by its plain language does not require a showing of an addiction or dependency that "cannot be treated." Rather, it requires "that the abuse must be of such a duration and nature that the circuit court determines that it renders the parent unfit for the reasonably foreseeable future to provide for her children." *In re P.C.*, 62 S.W.3d at 606.

While Father's drug abuse may be a treatable condition and he may eventually be able to refrain from methamphetamine use, Child is not required to remain in legal limbo for an indeterminate time. The established goal is to allow the child to find a permanent and stable home as quickly as possible. *In the Interest of Z.L.R.*, 347 S.W.3d 601, 609 (Mo.App. S.D. 2011). In the totality of the circumstances, when considering the history of drug abuse in the home, the positive methamphetamine test showing illegal drug abuse at the time of termination, and the preceding several months of intermittently missed tests, the trial court did not err in finding that Father will not be able to appropriately care for Child within the reasonably foreseeable future. Consequently, the trial court also did not err in finding ground for termination under subsection 211.447.5(6).

In his second point, Father contends the trial court erred in terminating his paren-

tal rights because there was insufficient evidence of ground for termination under subsection 211.447.5(3) and the findings it was required to make under that subsection were either absent or conclusory. In his fourth point, Father contends that the trial court erred in finding his consent to the adoption was unnecessary because he abandoned Child. We decline to discuss these argument because, as noted, the trial court's decision must only be supported by one ground for termination and we have already concluded two grounds were sufficiently shown. *See In re S.C.*, 914 S.W.2d at 413.

### Child's Best Interest: Sections 211.447(6) & (7)

■ In his third point, Father argues that the trial court erred in terminating his parental rights because the trial court failed to properly consider Child's best interest as required by subsection 211.447.6 in that it failed to consider relevant factors under subsection 211.447.7. Subsection 211.447.7 provides that when considering whether to terminate the parent-child relationship, the court is required to make findings on a number of specific factors. We review each in turn.

*(1) The emotional ties to the birth parent:* The trial court found that Child had "only limited ties to Father." Contrary to Father's contention, this finding is sufficiently supported by the record. While Father and Child appear to have developed some emotional ties, Child had been living with Foster Parents from the time she was one-and-a-half years old, and the evidence was that Child viewed Foster Parents as her parents and that she had bonded with Foster Siblings in a stable home. While Father complains that he was unable to forge a closer bond with Child because he was not allowed further visitation, we find this argument disingen-

uous. Father left Child in Mother's custody knowing of her drug abuse, thereby abetting the circumstances that led to the Division's assumption of jurisdiction, and left his one-and-a-half-year old Child in the custody of the trial court with no action other than a letter and a phone call for a critical ten months.

*(2) The extent to which the parent has maintained regular visitation or other contact with the child:* Father argues that the trial court failed to consider the extent to which he maintained visitation with Child as well as his pursuit of custody. We do not agree. The trial court noted that Father had maintained regular visitation with Child for the preceding year.

*(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so:* As previously discussed, there is adequate support in the record for the trial court's finding that Father had not provided for Child's care and maintenance when able to do so.

*(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time:* Father argues that the record does not support the trial court's finding that additional services would not allow a return of Child within an ascertainable period of time. While we agree with Father that there was an insufficient record as to whether additional services would allow Father to *eventually* take custody of Child, the record supports that it was unlikely for a lasting parental adjustment to occur within an ascertainable time period.

*(5) The parent's disinterest in or lack of commitment to the child:* The trial court found Father had disinterest and lack of commitment to Child. We agree with Father that he demonstrated interest and commitment after his return to Kansas

City, but we cannot ignore the time period preceding, in which he took little or no action to care for, communicate with, or protect Child.

*(6) Felony conviction:* Because no evidence was introduced of a felony conviction, the trial court made no findings on this factor.

*(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm:* The trial court also found Father had subjected Child to risk of harm by using methamphetamine in the home and having care, custody, and control of Child while under the influence of methamphetamine. Father does not provide argument against this finding.

On balance, we cannot find that the trial court abused its discretion in finding that termination was in Child's best interest. Father's third point is denied.

### Compliance with Statutory Procedures

In his fifth point, Father argues that the trial court erred in terminating his parental rights because the trial court failed to follow procedures required by chapters 211 and 453. While the failure to comply with statutory procedure is reversible error, "[e]ven objections that a juvenile officer or court failed to comply with mandatory requirements of the juvenile code must be properly preserved." *In re R.S.L.*, 241 S.W.3d at 350–51. In the record, we do not find that Father's claims of procedural violations were raised before the trial court. However, because the failure to comply is "open and obvious error," we exercise our discretion to review for plain error, which requires the error to have resulted in a manifest injustice. *Id.*

### Investigation and Social Study: Section 211.455

Father argues that because the trial court did not order an investigation and social study as required by section 211.455, the termination of his rights must be reversed. Section 211.455 provides in part that after the filing of a petition for the termination of parental rights:

The court shall order an investigation and social study.... The investigation and social study shall be made by the juvenile officer, the state division of family services or a public or private agency authorized or licensed to care for children or any other competent person, as directed by the court, and a written report shall be made to the court to aid the court in determining whether the termination is in the best interests of the child. It shall include such matters as the parental background, the fitness and capacity of the parent to discharge parental responsibilities, the child's home, present adjustment, physical, emotional and mental condition, and such other facts as are pertinent to the determination.

The purpose of the investigation and social study are to determine if termination is in the child's best interest. *In re C.M.B.R.*, 332 S.W.3d at 811; *In re R.S.L.*, 241 S.W.3d at 352. Because of the Legislature's use of the word "shall," the investigation and social study are mandatory. *In the Interest of C.W.*, 211 S.W.3d 93, 97 (Mo. banc 2007). Failure to strictly comply with the section is reversible error. *In re C.M.B.R.*, 332 S.W.3d at 811. Foster Parents concede that the procedure was not followed.

"Reversible error does not equate with the manifest injustice or miscarriage of justice." *In re R.S.L.*, 241 S.W.3d at 350–51. The trial court failed to follow a statutorily mandated procedure, but we

cannot find that this amounted to a manifest injustice. *See id.* at 807–10 (lack of statutory compliance in custody transfer did not result in manifest injustice); *In re R.S.L.*, 241 S.W.3d at 352. At the time of the termination proceeding, Child had been under the trial court's jurisdiction for over two years. The trial court heard testimony from the foster parent licensing agent who performed a home study on Foster parents, testimony from Child's Case Manager, who visited Foster Parents' home every other week, Foster Mother, Mother, Foster Father, Father, the therapist who supervised Father's visits, Child's therapist, the parents' joint counselor, and Child's GAL. The court had a home study that was done on Foster Parents, criminal case records of Father's, reports prepared by a Division caseworker, progress notes from Father's therapist, and reports from the aide who supervised Father's visits. Additionally, the Commissioner pursued her own questioning of witnesses. Father has failed to explain how additional reporting and investigation would have assisted his case. Consequently, because of the quantity of testimonial and documentary evidence before the trial court of "the parental background, the fitness and capacity of the parent to discharge parental responsibilities, the child's home, present adjustment, physical, emotional and mental condition, and such other facts as are pertinent to the determination," we do not find a manifest injustice.

*Assessment of Adoptive Parents; Sections 453.070 and 453.077*

Father next argues that we must reverse because the trial court failed to order an investigation and report for adoption as required by section 453.070 and 453.077.

■ Section 453.070 provides that no adoption decree may be entered until the trial court has ordered "a full investigation" of the suitability of the adoptive parents and of the child to be performed by the Division, "a juvenile court officer, a licensed child-placement agency, a social worker licensed pursuant to chapter 337, RSMo, or other suitable person appointed by the court" and for a written report to be provided to the court within ninety days of the court's request. § 453.070; *See also In re C.M.B.R.*, 332 S.W.3d at 812. Section 453.077 requires a "post-placement assessment" six months after the child has been placed in the adoptive parents' custody. *In re C.M.B.R.*, 332 S.W.3d at 812. The purpose of the reports is to determine the suitability of the parents and child for adoption and whether adoption is in the child's best interests. *Id.*

Here, the trial court's judgment states:

44. A full investigation has been made and a written report has been submitted to this Court as required by Section 453.070, R.S.Mo.

45. The Court has received and reviewed a post-placement assessment on the monthly contacts with the adoptive family.

. . .

47. The Court has received the recommendations of the Guardian Ad Litem and has received and reviewed the recommendations of the person placing the child, the person making the assessment and the person making the post-placement assessment.

. . .

52. Said minor person is suitable for adoption and the Petitioners are suitable as parents for said minor person.

Father, however, argues that the report submitted as Exhibit 14 was not ordered by the court, was thus not submitted within 90 days of the court's order, and that the report did not "report on the emotion-

al, physical, and psychological status of the child," nor did it include a background criminal check of Foster Parents.

■ We must reject Father's claim because he has failed to supply this court with a record of Exhibit 14. It is the duty of the appellant to provide the record on appeal. Rule 81.12(c). Rule 81.12(a) directs that "[t]he record on appeal shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision." Rule 81.12(e) specifically mandates that "[a]ppellant is responsible for depositing all exhibits that are necessary for the determination of any point relied on." If an exhibit is "not timely deposited," we may consider it "immaterial to the issues on appeal." Rule 81.16(c). Further, "[a]ll evidentiary omissions in the record on appeal are presumed to support the trial court's decision." *Thomas v. Dir. of Revenue*, 874 S.W.2d 427, 429 (Mo.App. W.D.1994). If there is no evidence from the record that will establish an appellant's claim, we do not convict a trial court of error. *Id.*

■ While it is within our authority under Rule 81.12(f) to order the record supplemented, given the statutory mandate to expedite appeals of the termination of parental rights and the delay that has already been manifested in this case, we decline to do so. *See* § 453.011.2(2) [4]; *D.G.N. v. S.M.*, 691 S.W.2d 909, 914 (Mo. banc 1985). Further, given the information before the trial court as to Child and as to Foster Parents, discussed *supra*, that Child was in Foster Parents' custody under the Division's supervision for more

than two years, and that a licensed child-placement agency performed a home study of adoptive parents and testified thereto, we find little suggestion of a manifest injustice.

### Juvenile Officer Not Made a Party; Subsection 211.447.2

■ Finally, Father argues that the trial court's failure to join the Juvenile Officer as a party violated his statutory and due process rights. He relies on *In re C.M.B.R.* and contends subsection 211.447.2(2)(b) required the juvenile officer's joinder. *See* 332 S.W.3d at 821. In *C.M.B.R.*, the Missouri Supreme Court reversed and remanded a termination and adoption proceeding. *Id.* at 823. It held that on remand, pursuant to section 211.447.2(2)(b), the "juvenile officer is required ... to seek joinder as a party so long as chapter 211 is pleaded in the petition." 332 S.W.3d 793 at 821.

Father's reliance on *In re C.M.B.R.* is misplaced. First, the supreme court's statement that "section 211.447.2(2)(b) requires the juvenile officer to be joined as a party to any proceeding when the petition to terminate parental rights is filed by someone other than the juvenile officer" must be read in its context. Subsection 211.447.2(2)(b) states:

Except as provided for in subsection 4 of this section, a petition to terminate the parental rights of the child's parent or parents shall be filed by the juvenile officer or the division, or if such a petition has been filed by another party, the juvenile officer or the division shall seek to be joined as a party to the petition, when:

4. Section 453.011.2(2) requires us to "expedite the contested termination of parental rights or adoption case by entering such scheduling orders as are necessary to ensure that a ruling will be entered within thirty days of the close of oral arguments, and such case

shall be given priority over all other civil litigation, other than children's division child protection cases, in reaching a determination on the status of the termination of parental rights or of the adoption...."

. . .

(2) A court of competent jurisdiction has determined the child to be an abandoned infant. For purposes of this subdivision, an "infant" means any child one year of age or under at the time of filing of the petition. The court may find that an infant has been abandoned if:

. . .

(b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]

Subsection 211.447.2(2)(b) is specific to the situation present in *In re C.M.B.R.*—the case of an abandoned infant. This subsection is not applicable to the instant case as Child was not adjudicated to be an abandoned infant.

Subsection 211.447.2(1), however, does require the juvenile office or the division to be joined when "[i]nformation available to the juvenile officer or the division establishes that the child has been in foster care for at least fifteen of the most recent twenty-two months." The proceedings complied with this provision. As noted by Foster Parents, the Division was made a party to the petition, and a representative participated at trial. Father's fifth point is denied.[5]

 In his seventh point on appeal, Father argues the trial court erred in denying his motion for judgment on the pleadings or in the alternative to dismiss because Foster Parents' amended petition failed to set forth allegations of specific fact pursuant to Rule 55.05. He contends that because the petition failed to allege specific facts leading to ground for termination, it failed to provide notice to Father and resulted in a procedurally unfair proceeding.

 Our review is governed by the Juvenile and Family Court Rules. Rule 125.02 requires a petition for the termination of parental rights to conform to Rule 113.01a and section 211.452. Section 211.452 requires the petition to contain: "(4) The facts on which termination is sought and the ground or grounds authorizing termination pursuant to section 211.447." This conforms with due process, which "requires that the petition in a termination of parental rights case should contain allegations likely to inform those persons involved of the charges, to the end that objection may be prepared." *In re J.M.N.*, 134 S.W.3d at 64–65 (internal quotation marks and citation omitted). We have previously held the petition to be sufficient if it tracks the language of the statute and gives the parent adequate notice of the allegations. *Id.* Here, the petition alleged each of the statutory grounds for termination found by the trial court. The allegations were sufficient to inform Father of the charges. *See In re J.M.N.*, 134 S.W.3d at 65; *compare In the Interest of H.R.R.*, 945 S.W.2d 85, 86–88 (Mo.App. W.D.1997) (reversing termination because trial court used grounds for termination different from those asserted in the petition).

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

MARTIN and WITT, JJ., concur.

---

5. In his sixth point on appeal, Father contends that the finding that there was ground to terminate his rights under section 211.447 was not supported by the evidence or by the law and reiterates his arguments. We have already addressed the substance of these arguments.