

# In the
# Missouri Court of Appeals
## Western District

IN THE INTEREST OF: S.D.,

JUVENILE OFFICER;   J.T.S. AND A.R.S.,

                    Respondents,

v.

L.K.T. (NATURAL MOTHER),

                    Appellant.

WD78349

ORDER FILED:

OCTOBER 13, 2015

---

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable John M. Torrence, Judge**

**Before Division Three: Karen King Mitchell, P.J., Lisa White Hardwick,and Anthony Rex Gabbert, JJ.**

L.T. (Mother) appeals the circuit court's judgment terminating her parental rights to her biological child, S.D.  Mother asserts that the circuit court's termination of her parental rights was unsupported by sufficient evidence pursuant to the grounds set forth in Section 211.447, RSMo Cum. Supp. 2014.  We affirm.

We consider the evidence in the light most favorable to the circuit court's ruling and ignore any evidence to the contrary.  *In re A.M.S.*, 272 S.W.3d 305, 307 (Mo. App. 2008); *In re B.J.K.*, 197 S.W.3d 237, 247 (Mo. App. 2006).  In the light most favorable to the court's judgment, the evidence at the termination of parental rights hearing showed that S.D. was born

November 15, 2011.  Mother had been incarcerated for two and a half months prior to S.D.'s birth and was released from incarceration on November 10, 2011.  When S.D. was born on November 15, 2011, both S.D. and Mother tested positive for Phencyclidine (PCP).  Mother initially denied the extent of her PCP usage but later admitted to having used PCP for approximately two years prior to S.D.'s birth and right up until his birth.

Due to S.D. testing positive for PCP at birth, a Newborn Crisis Assessment was completed by the Division of Social Services and a referral for protective custody and removal from parental custody was made to the Family Court.  The court did not initially remove S.D. from Mother's custody, however, and at a November 22, 2011, protective custody hearing S.D. was placed in his mother's custody under the supervision of the Children's Division.

On January 6, 2012, a protective custody assessment expressed concern that Mother was allowing her older son to have contact with S.D. in spite of the older son's conviction in the State of Washington for "First Degree Rape of a Child" and "First Degree Child Molestation" and in violation of his probation terms.  S.D. was then taken into protective custody.  At an adjudication hearing on February 21, 2012, Mother stipulated to the jurisdictional allegations the Juvenile Office set forth in its Second Amended Petition including that Mother had exhibited a pattern of neglect such that her ability to parent was impaired, that she had a history of illegal substance use and that she had used PCP during her pregnancy with S.D., that she exhibited poor parenting skills with regard to allowing her older son to babysit S.D., and that she had a history of criminal convictions and pending criminal cases including convictions for unlawful use of a weapon,

assault, and theft.[1]  Mother admitted that she was currently on probation in the State of Kansas and had failed to comply with the terms of her probation.  After hearing evidence, the court found S.D. to be subject to its jurisdiction pursuant to Section 211.031.1, RSMo Cum. Supp. 2012.  The court committed S.D. to the custody of the Children's Division.

As part of the November 22, 2011 protective custody hearing, Mother was ordered to undergo substance abuse evaluation and treatment and to be screened for Family Drug Court. Mother enrolled in a substance abuse treatment program at Renaissance West where she began the program on an inpatient basis and, after discharge, continued on an outpatient basis.  The record reflects that Mother sporadically attended classes and intermittently submitted to urinalysis testing.  She was discharged unsuccessfully from Renaissance West on June 8, 2012, and was incarcerated at the time of discharge.  While still involved with Renaissance West, Mother was offered the possibility of transitional housing.  Mother declined this offer indicating that she was not interested in living in transitional housing because she could not take her older son with her.  She advised a Renaissance West staff member that if she had to choose between her oldest son and S.D., that she would choose living with her older son and continuing to visit S.D.  On March 20, 2012, and May 16, 2012, Mother tested positive for PCP.

Mother tested negative for all drug tests administered from June 5, 2012, to March 1, 2013, however Mother may have been incarcerated for approximately six of those months. Mother testified in an August 7, 2014, deposition that she was incarcerated from May of 2012 until November of 2012.  S.D. was returned to Mother's physical care in March of 2013.  S.D.

---

[1]Mother was arrested in the state of Washington three years prior to S.D.'s birth for distribution of PCP. Mother's other criminal convictions include one conviction for driving under the influence, two convictions for assault, and several convictions for theft.  At the time of trial there was an outstanding bench warrant for Mother's arrest issued on May 2, 2014 for her failure to appeal at a hearing to revoke her probation in Johnson County, Kansas.

was removed from her care three days later when Mother tested positive for PCP. Thereafter, Mother tested positive for PCP on April 9, 2013 and positive for barbiturates on April 17, 2013. Mother was terminated from Family Drug Court on July 25, 2013. Penny Clodfelter, manager for the Family Drug Court Program for the Jackson County Family Court testified at the termination of parental rights hearing. Clodfelter testified that she had an initial meeting with Mother to assess Mother's suitability for the Family Drug Court Program. She testified that in that meeting she discussed the client participant handbook page by page. The second page of the participant handbook contains program rules. Aside from abstaining from the use of illicit drugs, in all capital letters the first rule states that alcohol consumption is not permitted. Clodfelter testified that she has a standard line that she uses when she discusses alcohol with participants to ensure there is no question as to what that means. She testified that she generally says something to the effect of:

> This means no beer, no wine, no champagne at a wedding or other holiday occasion, no shots, no margaritas, no mixed drinks. Check with your pharmacist regarding any over-the-counter medication. Also make sure you check with the pharmacist regarding mouthwash should you use mouthwash, because mouthwash often will have anywhere between 15 to 20 percent of alcohol in it. Then it's 'No alcohol, no alcohol, no alcohol.'

Clodfelter testified that after stating these things she then asks participants if they understand that there is to be no use of alcohol.

Prior to receiving substance abuse treatment from Imani House, from which she ultimately received a completion certificate on February 6, 2014, Mother failed to report for requested drug testing approximately nineteen times. Imani House records indicate one of Mother's "problems" to be "alcohol and drug use." As part of her treatment through Imani House, Mother was to abstain from using drugs and alcohol.

4

On May 17, 2014, mother tested positive for alcohol consumption. At trial, Mother testified that this was the result of consuming one glass of wine with her aunt. Mother's aunt testified that Mother had consumed two glasses of wine. Mother testified that she had never been informed that she was to abstain from alcohol consumption, but that she has abstained since being apprised.

The most recent drug test administered to mother prior to the October 22, 2014 trial was on June 7, 2014, and it was negative. Due to an apparent lapse in funding authorization and other issues unrelated to Mother, no attempts to administer drug tests to Mother were made between June 7, 2014 and October 19, 2014. On October 19, 2014, Ashley Hurn, the director of operations for the drug testing company DRAGNET, attempted to obtain a sample from Mother to complete a drug test. Hurn testified that he left three messages for Mother on October 19, 2014, but received no response. Mother testified that on October 19, 2014, she was not home and unable to call Hurn because she was at Research Medical Center the entire day with her father. She testified that she was at Research Medical Center from approximately 8:00 a.m. to 9:00 p.m. She testified that she had her cell phone with her but that her telephone does not receive signal in the hospital. Mother testified that she first saw Hurn's messages at approximately 10:30 p.m. on October 19. She testified that she returned his call the following morning while on her way to work but did not leave a message. Mother displayed her telephone in court showing an outgoing telephone call to Hurn on Monday, October 20, 2014, at 9:46 a.m.

On cross-examination, Mother was confronted with a social media posting that she had made the day Hurn attempted to call. Mother indicated in her post: "At my cousin house watching the CHIEFS & the F@#$ing lights go out …." When confronted with this information Mother testified that she also went to her cousin's house to watch the Chief's game on October

5

19 but could not have called Hurn because her phone was not charged. Mother was confronted with a posting from that same morning at approximately 9:10 a.m. where Mother wrote: "Gotta go get this money …. Workflow – feeling a lil hungover." Petitioner's Exhibit 17 shows a post at 1:13 a.m. from that same day stating: "F*** you, you, & you my life revolve around Lil STEVEY and [S.D.] – feeling tires of bullshit." When Mother was asked what she was consuming that made her feel hung over Mother replied, "I didn't say I was hung over. I said I felt hung over. I have been – I know how hung over feels. I done drank before; I done smoke before." Mother denied consuming alcohol or drugs prior to that post and denied consuming alcohol or drugs at any of the other events she had posted about on social media in the week prior to the court hearing. Mother had posted on October 16, 2014, at 11:18 pm: "Happy Hour w/ my son for his big 21st -- … at 54th Street Grill & Bar." On October 17, 2014, Mother posted pictures from a friend's house that she testified she frequented. The post included a photograph of a man whom Mother described as a friend of the family. With regard to that picture someone else posted, "He high as a kite," to which Mother responded, "Yes he is." When questioned at trial about what the friend was high on Mother indicated, "I don't know. I could tell he was high. I can see high." On October 18, 2014, Mother posted pictures of her attendance at a friend's birthday party.

On December 2, 2014, the court entered a judgment terminating Mother's parental rights pursuant to Sections 211.447.5 (2), 211.447.5 (3), 211.447.5 (6), and 211.447.6. Mother appeals.

In Mother's sole point on appeal she asserts that the circuit court erred in terminating her parental rights by contending that it had insufficient evidence to support its decision pursuant to

the grounds for termination of parental rights set forth in Section 211.447.[2] Mother does not dispute that she has a history of drug abuse, criminal activity, and incarceration that impeded her ability to care for S.D. and separated her from S.D. Mother contends, however, that there was insufficient evidence to support that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist such that there is little likelihood that those conditions will be remedied at an early date for reunification in the near future. Mother's primary assertion is that the court relied too heavily on her past behaviors and failed to give her enough credit for her present behaviors and the fact that she had been "clean" for an extended period of time prior to trial. We find no error.

Termination of parental rights is permitted when a statutory ground for termination is supported by clear, cogent, and convincing evidence and when termination is determined to be in the best interests of the child by a preponderance of the evidence. *A.M.S.*, 272 S.W.3d at 308. "When the trial court finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment this Court need only find that one of the statutory bases was proven and that the termination was in the best interests of the child." *In Re T.R.W.*, 317 S.W.3d 167, 170 (Mo. App. 2010). In our review, we "defer to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *Interest of K.A.W.,* 133 S.W.3d 1, 11 (Mo. banc 2004).

---

[2]Respondents argue that Mother's brief should be dismissed for failure to comply with Rule 84.04(d) due to Mother's point relied on lacking specificity and requiring reference to the argument portion of the brief where Mother challenges the court's judgment on all of the statutory grounds under Section 211.447 that the court relied on for terminating Mother's parental rights. We find that, while Mother should have challenged each of the statutory grounds under separate points, as we prefer to resolve an appeal on the merits of a case and can clearly ascertain Mother's arguments, we decline to dismiss the appeal for the deficiencies alleged by Respondent. *In re O.J.B.*, 436 S.W.3d 726, 729 (Mo. App. 2014).

The court terminated Mother's parental rights pursuant to several grounds including grounds specified under Sections 211.447.5 (2), 211.447.5 (3), and 211.447.5 (6).  Section 211.447.5 (3) allows the court to terminate parental rights to a parent when:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

In determining whether to terminate parental rights under this subdivision, the court is required to consider and make findings on the following factors:  1) compliance with terms of a social service program entered into with the Children's Division, 2) the success or failure of the efforts of the juvenile officer, Children's Division, or other agency to aid the parent on a continuing basis in adjusting his or her circumstances or conduct to provide a proper home for the child, 3) a mental condition rendering the parent unable to knowingly provide the child the necessary care, custody and control, and 4) a chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control. § 211.447.5 (3) (a)(b)(c)(d).  These factors "are not separate grounds for termination by themselves, but rather categories of evidence, that the court may consider along with all other relevant evidence in determining whether grounds for termination exist under § 211.447.5 (3)." *In re S.Y.B.G.*, 443 S.W.3d 56, 60 (Mo. App. 2014).  Although the court must make findings on all factors, proof of just one factor is sufficient to support termination of parental rights.  *Id.*

Upon review of the record we find that clear, cogent, and convincing evidence supports the court's judgment terminating Mother's parental rights pursuant to Section 211.447.5 (3).

8

At the time of trial S.D. was almost three years old and had been under the jurisdiction of the juvenile court and the custody of the Children's Division for all but approximately two months of his life. Three years prior to S.D.'s birth, Mother was convicted in the state of Washington for selling PCP. Mother used PCP throughout her pregnancy with S.D. When S.D. was born, Mother was immediately made aware of the State's concern regarding Mother's drug use and S.D.'s welfare due to that use. Mother was immediately provided treatment services. Nevertheless, when S.D. was nearly a year and a half old, Mother was still using PCP. Mother returned to this drug even after having significant periods of time where she presumably had no access to the drug due to being incarcerated. In March of 2012, she had had no positive tests for PCP for approximately nine months, but tested positive just three days after S.D. was returned to her care. Hence, the record reflects that Mother has an extended, documented history of substance abuse and that lengthy periods of abstinence have not been an accurate predictor of Mother's future behavior with regard to that abuse. This has been true even where abstinence achieved Mother's desired goal of reunification with S.D. Therefore, contrary to Mother's contention that the grounds upon which the court relied for termination were not in compliance with Section 211.447 because the court's findings focused too much on Mother's past behaviors, we find that, in Mother's case, an examination of the totality of her conduct, both past and present, was appropriate for the court to consider in making an ultimate determination as to whether the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, and whether there is a likelihood that those conditions will be remedied at an early date for reunification in the near future. *See In re S.Y.B.G.*, 443 S.W.3d 56, 61 (Mo. App. 2014). "'All grounds for termination must to some

9

extent look to past conduct because the past provides vital clues to present and future conduct."' *Id.* (quoting *In Interest of T.T.*, 954 S.W.2d 429, 432 (Mo. App. 1997)).

Our Missouri Supreme Court has stated that a "parenting, social services, reunification or treatment plan can provide a trial court with highly relevant evidence." *In re K.A.W.*, 133 S.W.3d 1, 10 (Mo. banc 2004). "A parent's efforts to comply with such a plan will provide the court with an indication of the parent's likely efforts in the future to care for the child." *Id.* "A lack of effort to comply with a plan, or a lack of success despite effort, can predict future problems." *Id.* With regard to Mother's compliance with the terms of social service plans entered into with the Children's Division pursuant to Section 211.447.5 (3) (a), the court noted that Mother had "not demonstrated that she is clean and sober" because of her inconsistency in participation with substance abuse testing as recently as the week before trial. The court concluded that this inconsistency "demonstrates her lack of commitment to her child and maintaining a clean and sober lifestyle." The court found that Mother had "not demonstrated a long enough period of sobriety to convince the court that the child is safe in her care." The court noted that Mother had an outstanding criminal warrant for her arrest at the time of trial. The court found that Mother's continuing pattern of criminal activity and substance abuse had resulted in her absence from S.D.'s life and that this would "continue to negatively impact her ability to provide and care for her child in the future." Pursuant to Section 211.447.5 (3) (d), the court found Mother to suffer from a chemical dependency preventing her from being able to consistently provide the necessary care, custody and control of S.D. The court noted Mother's extensive drug history, prior conviction for driving under the influence of alcohol, and her positive test for alcohol use in May of 2014, despite being warned to not drink alcohol in her substance abuse treatment programs.

Mother disputes an alcohol problem, indicates that she was never told that she should not drink alcohol, and mentions that her driving while under the influence conviction occurred many years ago. She maintains that the court erred in emphasizing her positive test for alcohol use to support termination when her substance abuse issues involved illegal drugs and there is no evidence in the record that she abuses alcohol. She argues that the court's focus should have been on the fact that she has had no positive drug tests for a very lengthy period of time.

We find that, given the fact that the court was entitled to believe, based on the evidence, that Mother was advised in no uncertain terms that alcohol use was inconsistent with sobriety, and Mother's lack of sobriety was the primary reason for S.D. being removed from her care and remaining out of her care, the court was justified in considering Mother's recent alcohol use when considering whether conditions of a potentially harmful nature continue to exist that impede reunification. Further, the court was justified in placing significance on Mother's failure to submit to drug testing prior to trial. The record reveals that, during the time that the Children's Division worked with Mother, there were numerous instances where Mother failed to appear for drug testing. Compliance with drug testing was required under Mother's social service plans that identified for Mother necessary steps for reunification. Mother's first "goal" in her Written Service Agreement with the Children's Division that she signed on April 16, 2013, was "To get my son ([S.D.]) back into my custody." One of the tasks Mother specified to accomplish that goal was: "Do [not] miss any visits/UA's." Although Mother claimed at trial that she did not receive Dragnet's messages the day they were sent, she also testified that she was with her father at Research Medical Center the entire day Dragnet attempted to call. It was revealed on cross-examination that Mother was not at the hospital the entire day but was at her cousin's house at least part of that day. Mother had posted on a social media site that morning,

11

"feeling a lil hungover." We find that the evidence was such that the court was justified in inferring that Mother avoided submitting to drug testing prior to the termination of parental rights hearing and that such avoidance was suggestive of a continued lack of sobriety.

Mother's second goal on her Written Service Agreement was to obtain her own place to live. Mother's third goal was "to stay drug free by taking one day at a time." Tasks Mother designated to accomplish staying drug free included, "to change my surrounding[s]," "get m[e] a sponsor to talk to," "learn my triggers," and "don't indulge." Pursuant to Section 211.447.5 (3) (b) the court found that mother had failed to adjust her circumstances and conduct on a continuing basis to provide a proper home for S.D. The court noted that, although Mother had gained some recent stability through employment and by living with a cousin, Mother's name is not presently on the lease for her residence and during the two and a half years prior to trial Mother had lived in several different residences with various family members, had lived in substance abuse treatment centers, and had been incarcerated. The court deemed Mother to have not yet demonstrated herself to be self-supporting or able to support S.D. We find that clear and convincing evidence supported this conclusion.

Therefore, we find clear and convincing evidence to support the court's judgment of termination of parental rights pursuant to Section 211.447.5 (3). The record reflects that S.D. has been under the jurisdiction of the juvenile court for a period of one year and that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, such that there is little likelihood that those conditions will be remedied at an early date so that S.D. can be reunified with Mother in the near future. Clear and convincing evidence supported the court's conclusion that Mother has not significantly complied with the terms set forth in her Written Service Agreement and that Mother had been provided

12

extensive services that had not proven successful as evidenced by Mother's recent alcohol use, avoidance of drug testing, and social media posts that allowed for the inference of her continued use of impairing substances.

Additionally, we find that a preponderance of the evidence supports that termination of parental rights was in S.D.'s best interest. At the time of trial, S.D. was nearly three years old and had lived with Mother only two months of those three years. The evidence supports the court's conclusion that Mother's volitional criminal activity and drug use caused Mother to be absent from S.D.'s life and that that absence contributed to S.D. having a weak emotional attachment to his mother. The evidence supports the court's finding that there are no additional services to offer Mother that would be likely to bring about a lasting parental adjustment to enable S.D.'s imminent return to her. Mother's point on appeal is denied.

We conclude, therefore, that the circuit court did not err in terminating Mother's parental rights pursuant to Section 211.447 as the evidence was sufficient to support the court's judgment. We affirm the circuit court's judgment.

_____
Anthony Rex Gabbert, Judge

All concur.