EDWARD R. ARDINI, JR., JUDGE
Father appeals the Judgment of the Circuit Court of Jackson County terminating his parental rights. On appeal, Father alleges that (1) there was not clear, cogent, and convincing evidence to support termination of his parental rights on the statutory grounds specified in the trial court's Judgment; (2) the court, in terminating his parental rights, misapplied section 221.447;[1] and (3) the trial court erred in not returning Child to Father pursuant to section 211.037. The Judgment is affirmed.
PROCEDURAL & FACTUAL BACKGROUND
"We consider the evidence in the light most favorable to the [trial] court's ruling and ignore any evidence to the contrary." In re S.D. , 472 S.W.3d 572, 573 (Mo. App. W.D. 2015) (citations omitted). Child was born on July 21, 2008, and lived with Mother and Child's great-grandmother. In May 2011, a petition alleging parental abuse and neglect was filed. The court took temporary protective custody of Child and ordered that the Children's Division immediately begin proceedings to determine the paternity of Child. In July 2011, Child was placed with her current foster family. The initial case was dismissed and refiled on August 12, 2011. Thereafter, Child was found to be in need of the care and protection of the court.
In an effort to reunify Mother and Child, the court ordered services such as visitation, assignment of a parent aide, and individual counseling. These efforts were not successful and, in July 2012, the permanency goal was changed to termination of parental rights.
Father first become aware that Mother was pregnant with Child approximately three months into the pregnancy. Although he knew of his potential paternity, Father made no effort to establish a relationship with Child and provided no financial support. This lack of financial contribution to Child's care continued throughout the pendency of this action despite Father earning significantly more income each month than he incurred in living expenses. Moreover, while Father feared that Child was at risk of physical harm while in Mother's custody, he took no action to secure Child's safety.
On February 6, 2014, the current caseworker performed an on-line search and *901 identified an address for Father. After receiving a letter regarding his possible paternity, Father contacted the caseworker later that month and agreed to a paternity test. Father spoke with the caseworker again on March 6, 2014, this time with the assistance of an interpreter. During the meeting, Father expressed concerns because he was not a legal citizen. Father's paternity was established on March 19, 2014, and Father and the caseworker met on May 16, 2014, to discuss the results. At the next permanency review hearing, Father appeared and was appointed counsel. The hearing was otherwise continued.
On August 12, 2014, the court ordered that Father be allowed therapeutically supervised visits, ordered initiation of an Interstate Compact for the Placement of Children ("ICPC")[2] home study due to Father being a resident of Kansas and, pursuant to the request of Father, ordered that mediation occur between Father and the foster parents. During a visit on September 25, 2014, Father indicated that he would like to pursue legal custody and that he had started to contact immigration attorneys.[3]
On October 7, 2014, a permanency review hearing was held, and the court ordered that Father be provided up to forty hours per month of visitation supervised by a bilingual parent aide. The Children's Division was given discretion to include unsupervised time during Father's visitation as deemed appropriate. Father began supervised visits with Child in November. The visits were initially supervised by the caseworker and later were supervised by a parent aide who was not bilingual.
The next permanency review hearing was held on February 19, 2015. Father's visitation remained supervised, but the court ordered that parent aide services be increased to eight hours per week and that the Children's Division move promptly towards "sandwiched" visits in an effort to provide Father additional time to work with Child on their relationship. In efforts to meet the court's order that Father receive eight hours of supervised visits per week, Father was provided with the dates and times that Child was available for visits as well as her extracurricular activities and school events schedules. In addition, the court allowed the foster parents to supervise visits between Father and Child.
Another permanency review hearing was held on May 26, 2015, at which time the court ordered mediation. Father and the foster parents participated in mediation on July 20, 2015, agreeing to exchange residential and email addresses as well as phone numbers, that a relationship between Father and Child was in Child's best interest, and that visits in Father's home was an appropriate next step. Although Father received ICPC-approval for home visits and possible placement, he cancelled the first home visit scheduled for July 29, 2015.
The goal for Father was changed from reunification to termination of parental rights at the permanency review hearing held on August 13, 2015. The court found that Father had "been participating in visitation with the child for approximately one year in order to establish a relationship ... but little to no progress has been made" and that Father had declined a Spanish-speaking aide and English as a Second Language ("ESL") classes. The court also found that "recently his sister, with whom he lives, has refused to allow visitation to occur in her home" and that *902 Father had "cancelled a number of visits due to not having gas money." Additionally, although "[C]hild ha[d] become comfortable with her father," she had "indicated she would prefer visits occur in the foster home." A Petition for Termination of Parental Rights was filed November 5, 2015.
The next permanency review hearing was held on December 3, 2015. The permanency goal remained termination of parental rights, but the court ordered that Father continue to be provided supervised visitation. The caseworker submitted to the court a report dated December 8, 2015, and recommended termination of parental rights for Father, stating that Child had been with her current foster family for four years with no permanency, there was "still work to be completed in developing a relationship between the two[,]" she did not know what Father's parenting of Child would look like since home visits were unable to occur, and "[Child] would like to continue with life as she knows it."
In March 2016, in-home visitation began. On May 26, 2016, a permanency review hearing was held and the court ordered that Father continue to have supervised and "sandwiched" visits and that he provide 24-hour advanced notice if he was cancelling a visit. Child had previously expressed a desire to decrease visits, and they were decreased to twice a month.
Trial was held on October 24 and 25, 2016. At the time of trial, Father was receiving two visits per month, one at his home and one in the community. The visits were "sandwiched" in that they began and ended with the parent aide present but were otherwise unsupervised.
At trial, the court took judicial notice of the underlying jurisdictional proceedings, and the following witnesses testified: Melanie Hicks, the caseworker from January 2014 to September 2014 and supervisor since that time; Nicole Cole, the parent aide for Mother from April 2014 to December 2014; Sarah Wright, the child's therapist throughout the case; Rokea Wright, the parent aide for Father from November 2014 to May 2016; and Tanisha Davis, the caseworker from October 2014 to the time of trial. Father and his sister also testified. Numerous exhibits were admitted, including the caseworker's TPR report dated December 8, 2015; records from Child's therapist; the paternity results regarding Father and Child; correspondence from the caseworkers to Father; the ICPC Home Study; and the records of the parent aide who worked with Father. The Judgment terminating Father's parental rights was entered on January 25, 2017.[4] This appeal follows.
STANDARD OF REVIEW
In reviewing a judgment terminating parental rights, "we defer to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." In re S.D. , 472 S.W.3d at 576 (citation and internal quotation marks omitted). The evidence is viewed "in the light most favorable to the [trial] court's ruling[,] and [we] ignore any evidence to the contrary." Id. at 573 (citations omitted). "We will not reverse the trial court's decision unless we are left with the firm belief that the decision *903 was wrong." In re C.A.M. , 282 S.W.3d 398, 404 (Mo. App. S.D. 2009) (citations omitted); see also In re B.H. , 527 S.W.3d 167, 171 (Mo. App. W.D. 2017).
DISCUSSION
Termination of parental rights requires a two-part analysis. First, "a statutory ground for termination [must be] supported by clear, cogent, and convincing evidence[.]" In re S.D. , 472 S.W.3d at 576 (citation omitted); § 211.447.6. Second, the court must determine by a preponderance of the evidence that "termination is ... in the best interests of the child." Id. (citation omitted); § 211.447.6-7. "When the trial court finds multiple statutory grounds for termination of parental rights," we "need only find that one of the statutory bases was proven and that the termination was in the best interests of the child" in order to affirm the judgment. Id. (citation omitted).
Father's first and second points on appeal allege that (1) there was not clear, cogent, and convincing evidence to support termination of his parental rights or conclude by a preponderance of the evidence that termination was in the child's best interest under section 211.447 and (2) that the trial court erred in its application of the statute.[5] Because both points involve nearly identical facts and inter-related analysis, we will address them together by first examining whether there was a statutory ground for termination of Father's parental rights and then considering whether termination was in Child's best interest.
1. Grounds for Termination of Parental Rights under Section 211.447.5
Here, the trial court terminated Father's parental rights pursuant to the grounds specified in sections 211.447.5(2), 211.447.5(3), and 211.447.5(6). We will first address the court's findings regarding section 211.447.5(3), which allows for termination when "[t]he child has been under the jurisdiction of the juvenile court for a period of one year" and:
the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home ...
(emphasis added).
We find that clear, cogent, and convincing evidence supports the court's Judgment terminating Father's rights pursuant to section 211.447.5(3). First, Child was under the jurisdiction of the juvenile court of five years, beginning just prior to age three to the age of eight. See § 211.447.5(3) (requiring that the child be under the court's jurisdiction for at least one year). Although Father was not involved with Child at the time that the court assumed jurisdiction over her, his visitation with Child began more than two years prior to trial.
*904 Father grounds his argument on the fact that he did not create or arguably allow to exist the conditions that led to the assumption of jurisdiction, i.e. , the abuse and neglect by Mother, and therefore could not remedy those conditions. However, Father's narrowly focused argument ignores that the provision also permits termination of parental rights if "the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." § 211.447.5(3). Further explained below, clear, cogent, and convincing evidence supports the finding of the trial court that continuation of Father and Child's relationship greatly diminished her prospects for early integration into a stable and permanent home.
Section 211.477.5(3) also requires the court to consider and make findings on four factors. The court found that the two factors relating to mental conditions and chemical dependencies did not apply to Father. See § 211.447.5(3)(c)-(d). However, the court made several findings relating to factor (a), "[t]he terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms[,]" and factor (b), "[t]he success or failure of the efforts of the juvenile officer, the division[,] or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child[.]" See § 211.447.5(3)(a)-(b).
Because the court's findings regarding these two factors are substantially similar, we outline and address them together. The court found that although "[n]o evidence was presented that Father signed any written service agreements[,]" "numerous services" were offered to Father "in order to facilitate reunification." Father nevertheless "affirmatively failed to adequately engage throughout the duration of the underlying cause to adjust [his] circumstances and address and remedy the conditions which [he] needed to address to allow for reunification." The court specifically noted that "Father ... failed to adjust his circumstances to facilitate the creation of a parent-child bond between him and [Child], thereby preventing the possibility of her transition to his home." The court relied on evidence that Father resisted visitation with Child in his home, that Father refused to participate in ESL programs, and that Father did not pursue suggestions made by the parent aide intended to build the parent-child relationship. The court concluded that these circumstances were "of a long and continuing duration" and rendered "Father unable now and for the reasonably foreseeable future[ ] to care for the physical, emotional, and mental needs of the child."
Clear, cogent, and convincing evidence supports these findings. The evidence at trial established that Father had two years of visitation with Child and that services such as an interpreter, ESL classes, and parenting lessons were offered or recommended to Father. An interpreter was present at caseworker Hicks's initial meetings with Father and during his initial visitations with Child. Although Father and Child connected, there was a lack of verbal communication between the two and Father did not initiate conversation with Child. The slow growth of the relationship between Father and Child as visitations continued was often attributed to the language barrier between the two.
In efforts to remedy the language barrier, the agency reached out to the Mexican consulate regarding parent aide services. The consulate replied that it would "look[ ] into some alternatives" regarding the language barrier but that Father had indicated the "real problem" was that social *905 workers were not available to facilitate visits the days and times that Father was available. Efforts to arrange for a Spanish-speaking parent aide continued, but Father indicated that he did not have a preference in working with a Spanish- or English-speaking parent aide because he understood the English-speaking parent aide currently assigned to the case.
ESL classes were also recommended to Father, and information regarding ESL classes was provided to him. Father continued to maintain that services such as a Spanish-speaking parent aide and ESL classes were unnecessary because he and Child were able to communicate. He also did not participate in services such as ESL classes because they conflicted with his work schedule. Although Father worked two part-time jobs and had limited availability, the caseworker testified that she believed he should have prioritized his schedule to accommodate ESL classes, lessen the language barrier between Father and Child, and advance the bond between the two.
Aside from attempts to address the language barrier, the therapist recommended in January 2015 that a parenting component such as classes or a one-on-one setting with the parent aide be added to Father's services. The parent aide reported that she had "attempted to introduce some parenting lessons to [Father,] but he [did] not comprehend the information." In July 2015, the therapist also recommended that visits be moved from activity centers such as Chuck E. Cheese, PowerPlay, and Paradise Park to a library or regular park in order to "force[ ] increased interaction." The parent aide reported that she suggested to Father moving the visits to the library or having a picnic but that Father continued to choose activity centers as the locations for the significant majority of visits.
The caseworkers attempted to have at least once a month parent-worker visits with Father, but he only complied with the initial requests in March and May 2014. Father also did not attend all of the Family Support Team ("FST") meetings, despite monthly letters encouraging him to participate in case management services so that he could visit with Child.
In an effort for Father and Child to spend more time together, Father was sometimes provided with the dates and times that Child was available for visits as well as her extracurricular activities, such as violin lessons and soccer games, in addition to other school events. Despite being provided these schedules, Father minimally attended such activities. In an effort to increase Father and Child's visitation hours, the court entered an order to allow the foster parents to supervise visits between Father and Child.
An ICPC-home study was also requested when the goal was reunification, and Father's home approval was received at the end of May 2015. The first home visit was to occur July 29, 2015. However, Father contacted the parent aide and informed her that his sister, with whom he lived, did not want visits in the home, and the visit did not occur. This position is reflected in the court's findings from the permanency review hearing attended by Father on August 13, 2015, when the goal was changed from reunification to termination of parental rights. Father's sister later sent an email to the guardian ad litem and testified at trial that she did not have any issues with visitation occurring at the home. Home visits eventually began on March 8, 2016. At trial, Father testified that he and his sister had a disagreement unrelated to Child when the home visits were to initially begin in 2015 and cancelled the visit because they were upset.
*906 Father argues that the statute speaks of a "social service plan" and not "ordered services" as relied on by the court. However, "[t]hese factors are not separate grounds for termination by themselves, but rather categories of evidence[ ] that the court may consider along with all other relevant evidence in determining whether grounds for termination exist under § 211.447.5(3)." In re S.D. , 472 S.W.3d at 577 (emphasis added) (citation and internal quotation marks omitted). The evidence is clear, cogent, and convincing that Father was offered but did not accept all of the services that were offered or recommended in order to develop the relationship between Father and Child. As further described below, the slow growth of the parent-child relationship between Father and Child "greatly diminishe[d] the child's prospects for early integration into a stable and permanent home" and supported the termination of Father's rights under section 211.447.5(3).
2. Best Interests of the Child under Section 211.447.7
After determining that there was a statutory basis for terminating Father's rights, the court next considered whether termination was, by a preponderance of the evidence, "in the best interests of the child." See In re S.D. , 472 S.W.3d at 576 (citation omitted); § 211.447.6-7. The court considered six of seven factors relating to the best interests of the child enumerated under section 211.447.7. This section instructs the court to "evaluate and make findings" on factors "appropriate and applicable to the case[.]" § 211.447.7. "The evaluation required is a subjective assessment of evidence[,] and we do not reweigh the evidence upon appellate review." In re A.A.T.N. , 181 S.W.3d 161, 167 (Mo. App. E.D. 2005) (citation and internal quotation marks omitted); see also In re A.C.G. , 499 S.W.3d 340, 344-45, 349 (Mo. App. W.D. 2016) ; In re C.A.M. , 282 S.W.3d at 409. For ease, we review the factors out of order.
Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time. § 211.447.7(4). As extensively outlined above and found by the trial court when considering this factor, Father was "offered several services by Children's Division throughout the pendency of the underlying action" but "failed to rectify the barriers to reunification[.]"
The emotional ties to the birth parent. § 211.447.7(1). As to this factor, the court included findings such as "although [Child] has grown more comfortable in visitation with Father, there has been no forging of a significant parent-child relationship between the two" and "[Child] typically refers to Father as "[his name]" or "Mister" or "Dude."
Substantial evidence supports these findings. Although visits between Father and Child occurred for two years, the child's therapist testified that she did not believe Child had an emotional bond with Father. Child was very talkative about her connections with other people, the things that she likes, etc., but would only communicate about where she met with Father for visits rather than describing their interactions. Child referred to Father as "dad" in November 2014 but subsequently called him by his name and indicated that she would never call him dad. Child requested that visits be reduced, which the therapist testified would not be expected if there was an emotional bond. The parent aide testified that Child would ask "how much longer she would have to go on visits" and if visits could be cancelled. When Child requested reduced visits and "did not feel that she was being heard[,]"
*907 "she started ... shutting down[.]" Child never expressed a desire to live with Father, and when the topic was discussed with the caseworker, Child indicated that she did not want to live with Father. Child has expressed that "[s]he would prefer that the visits occur in her home where she resides with [her foster family]."
Prior to Father's involvement, Child was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), which could affect her ability to bond and cause Child difficulty accepting strangers, with people touching her, etc. Although the onset of Child's PTSD is not attributed to Father, Child's natural reaction to any perceived threat or trigger is to revert back to her "safe place." Child considers her "safe place" to be her foster home. She refers to her foster parents as "mom" and "dad" and has expressed that she wishes to be adopted by her foster parents. Child has bonded with her foster parents, teachers at school, and close friends.
The parent aide, therapist, and caseworker all similarly testified that termination of Father's rights was in Child's best interest because Child's foster home provides her safety and stability and a parent-child bond had not developed between Father and Child. "[A] lack of bonding is substantial evidence supporting that termination is in the best interest of the child[.]" In re C.A.M. , 282 S.W.3d at 408 (citations omitted); see also Missouri Dep't of Soc. Servs. v. B.T.W. , 422 S.W.3d 381, 395 (Mo. App. W.D. 2013) (holding that best interest determination was supported by, inter alia , the lack of bond between child and father). For permanency, the therapist recommended that Child be adopted by the foster family but continue to have contact and visits with her biological father's family. The therapist testified that removal from her foster family would be "like [the loss] or death of a parent. She would be extremely unstable." Child would likely initially escalate behaviors and then "stop relating to other people the way that she desperately needs." Such a change "would emotionally affect her [and] ... impact her for a very long time."
The parent's disinterest in or lack of commitment to the child. § 211.447.7(5). As to this factor, the court included findings, supported by the evidence presented at trial, that Father failed to engage in services "intended to bolster the parent-child bond[,]" such as ESL classes; that Father failed to consistently attend Child's extracurricular activities, despite being provided with a schedule; and that the discrepancy between his statements and Child's aunt to the Children's Division regarding home visitation "indicate[d] a lack of interest in meaningfully interacting with the child."
The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency. § 211.447.7(3). The court found that "Father earns significantly more income each month than he incurs in living expenses" but sends his supplemental money to family members rather than making "any financial contribution to [Child]'s care." These findings are supported by the evidence. Although we did not find evidence that Father was asked to provide financial support for Child, we note that even absent a court order or request from the Children's Division, "[p]arents are obligated to support their children even if they are in the custody of the Division[.]" In re D.D.C. , 351 S.W.3d 722, 731 (Mo. App. W.D. 2011) (citation omitted); see also In re M.J.H. , 398 S.W.3d 550, 561 (Mo. App. S.D. 2013) ("A parent is obligated to provide support even in the *908 absence of a demand for payment." (citation omitted)).
The extent to which the parent has maintained regular visitation or other contact with the child. § 211.447.7(2). Here, the court found, in part, that although "Father has maintained generally regular visitation with the child since November 2014[,]" he "often arrives late to visits and fails to confirm all scheduled visits[.]" This finding was supported by the evidence.
Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm. § 211.447.7(7). In support of this factor, the court found, and the evidence supported, that Father had received a phone call from Mother when Child was a baby in which Mother alleged Father's paternity and struck Child, purportedly so that Father would hear her cry. Despite fearing that Child may be at risk of physical harm while in Mother's custody, Father "took no action to secure the child's safety."
In sum, a preponderance of the evidence, particularly the evidence regarding the services offered to but declined by Father and the lack of progression of the parent-child bond between Father and Child after two years of visitation, supports the conclusion that termination of Father's parental rights is in Child's best interest. We recognize that Father has made efforts to establish a relationship with Child by, for example, participating in a majority of visitation opportunities provided. Additionally, bonding between Father and Child was understandably slow due to factors such as Father's late involvement, Child's previous experiences and PTSD, and the language barrier between the two. However, Father knew of his potential paternity as early as Child's infancy and failed to provide support, report Mother's possible abuse/neglect of Child, or otherwise act (apparently out of fear of Mother and due to his immigration status). Additionally, Father was offered services such as parenting lessons and ESL classes in an effort to facilitate the development of the relationship and bond between Father and Child and thereby improve the likelihood of reunification. Despite being apprised of concerns, he continually denied the need for such services. As stated in In re C.A.M. , we must ultimately "view the evidence in the light most favorable to the trial court's judgment" and "give deference to the trial court's ability and opportunity to judge the credibility of the witnesses." 282 S.W.3d at 409 (citation omitted); see also In re A.C.G. , 499 S.W.3d at 343 n. 1, 344-45. The evidence supports the trial court's Judgment, and we must deny Father's first two points on appeal.
Although Father was not involved with Child at the time that she was taken into custody, in light of our conclusion that the evidence supports the trial court's Judgment terminating Father's parental rights, we need not address Father's third point that the trial court erred in not returning Child to Father as "a nonoffending parent entitled to physical custody" under section 211.037.
CONCLUSION
The Judgment of the trial court is affirmed.
All concur.

All statutory citations are to the Revised Statutes of Missouri 2016 as supplemented.

See generally § 210.620.

Although Father resided in Kansas, his was not a legal citizen.

Mother appeared without counsel and actively participated in the proceedings until she "voluntarily chose[ ] to remove herself from further participation" in the case on October 25, 2016. Her rights were also terminated, and although she filed a Notice of Appeal, she did not file a timely brief and her appeal was dismissed on August 31, 2017.

Father's points on appeal present multiple distinct legal issues. "[A] point relied on should contain only one issue, and parties should not group multiple contentions about different issues together in one point relied on. Points that include more than one issue are multifarious and preserve nothing for review." City of Joplin v. Wallace Bajjali Dev. Partners, L.P. , 522 S.W.3d 327, 330 (Mo. App. S.D. 2017) (citations omitted); see also State v. Leonard , 490 S.W.3d 730, 736 (Mo. App. W.D. 2016). However, we may "review multifarious points ex gratia. " Id. at 331 (citation omitted); see also Leonard , 490 S.W.3d at 736-37.